**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| WHB BILTMORE, LLC, and | ) | |
| MILLENNIUM & COPTHORNE | ) | |
| INTERNATIONAL LIMITED | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.:_____ |
| | ) | |
| v. | ) | |
| | ) | |
| HIGHGATE HOTELS, L.P, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs WHB Biltmore, LLC ("**Biltmore Owner**" or "**Owner**") and Millennium & Copthorne International Limited (the "**Registrant**"), by and through their undersigned counsel, Fox Swibel Levin & Carroll, LLP, for its Complaint against Defendant Highgate Hotels, L.P. ("**Highgate**"), alleges as follows:

## INTRODUCTION

1.      Until it was terminated for cause on August 3, 2023, Highgate was the hotel manager for the Millennium Biltmore Hotel, a historic luxury hotel located in downtown Los Angeles, California (the "**Biltmore Hotel**"). The termination triggered Highgate's clear contractual obligation to cooperate and transition operations and assets back to Biltmore Owner. Yet, Highgate has not accepted its termination, and instead remains in possession and control of Plaintiffs' real property, intellectual property, bank accounts, and business assets.

2.      Plaintiffs regrettably have no choice but to file this Complaint seeking injunctive and/or emergency relief to enforce the termination provision of Highgate's contract, expel Highgate from the Biltmore Hotel, prevent Highgate from exercising control and use of Plaintiffs' property, and ensure the orderly and peaceable turnover of assets to Plaintiffs.

1

3.      Absent such relief, Highgate will be a revoked agent left with unfettered access to, and control over, Biltmore Owner's business, property, and assets. Irreparable harm will result if this revoked agent, who has proven to be incompetent, disloyal, and dishonest, is permitted to lawlessly serve as ambassador for Biltmore Owner's brand and exploit Registrant's trademarks. The equities strongly favor Plaintiffs, as Highgate's interest against such relief is merely monetary – the management fees it (incorrectly) claims would be owing in the future were its agency not terminated.

4.      The termination giving rise to this suit is the culmination of roughly a year of interactions between Biltmore Owner and Highgate, which induced Biltmore Owner to execute a Hotel Management Agreement dated January 6, 2023 (the "**HMA**"). Prior to this date, Biltmore Owner profitably managed the Biltmore Hotel, and steered the property through the COVID-19 pandemic that posed substantial challenges for the hospitality industry. Emerging from the pandemic, Biltmore Owner welcomed alternative strategies to maximize profitability of this business, and as such entertained a pitch from Highgate to take over as hotel manager.

5.      Central to Highgate's pitch were detailed pro forma financial statements, which represented that Highgate's plans and resources would unlock significant increases in earnings, well beyond what Biltmore Owner had historically achieved. The financial statements contained eight-figure increases in bottom line net profit over the course of the next five years. Highgate, which held itself out as an expert in hotel management, assured Biltmore Owner that within the first year, moving management to Highgate would "easily" result in double-digit percentage increases to net profit. Highgate's words and acts communicated that, at the commencement of the agreement, it would have the resources, plans, and personnel necessary to achieve the results promised.  Biltmore Owner principally relied upon these representations in entering the HMA.

6.     Less than four months after the execution of the HMA, Highgate presented a budget that departed significantly from Highgate's pre-contractual representations which Biltmore Owner relied upon to give management of the Biltmore Hotel to Highgate. The new budget increased planned expenses, reduced planed revenue, and virtually eliminated the profit increase represented to Biltmore Owner before the HMA.

7.     Highgate was unable to explain what changed to cause these revisions, nor why these figures were not shared before the execution of the HMA.  Indeed, in the two-month period leading up to the HMA, Highgate acted as interim asset manager for the Biltmore Hotel, affording Highgate full access and control over the Biltmore Hotel's business and financial data, and giving Highgate first-hand, on the ground observation of the conditions present there.

8.     Highgate had numerous opportunities to advise Biltmore Owner of new concerns with its original representations following its two-month tenure as interim asset manager, and to revise its pro forma financial statements *before* the HMA was signed. But Highgate never communicated to Biltmore Owner that its represented financial performance was unachievable, nor that its plan would result in materially worse outcomes for Biltmore Owner than were shown in the figures used to induce Biltmore Owner's agreement.

9.     The Biltmore Owner rejected Highgate's arbitrary attempt to shift its goalposts and demanded that Highgate present a budget that conformed with the pro forma financial statements, along with the planning documents required by the HMA, which had still not been delivered even though Highgate represented that its pro forma financial statements were based on these plans.

10.    Now, seven months into Highgate's tenure, Highgate's management of the Biltmore Hotel is an utter disaster. It is clear that Highgate never had a staffing and revenue plan

in place, as it had represented. No transition plan was ever presented, despite contractual requirements to do so. Neither did Highgate present a sales and marketing plan or capital expenditure plan. Highgate took months to find a general manager, and the Biltmore Hotel operated for nearly seven months without a sales director.

11.     Under Highgate, the Biltmore Hotel has operated as a rudderless ship. Unsurprisingly, Highgate's misfeasance has cratered the Biltmore Hotel's profitability. Highgate failed to reasonably control expenses, which have increased well beyond the representations in its pre-contract financial statements, and exceed even the inflated totals in Highgate's post-contract budget.

12.     Profit centers, such as food and beverage, that historically earned millions each year now operate at a substantial loss, after considering direct expenses and overhead expenses. Sales activity for group, corporate, and conference events are worse than COVID levels, due to Highgate's inability to staff a salesforce or implement a plan to obtain these sales.

13.     Biltmore Owner would never have agreed to the HMA without Highgate's assurances that it was able to substantially improve profitability of the Biltmore Hotel (net of payment of fees to Highgate) *beyond what Biltmore Owner was already achieving for itself*. Yet Highgate has not only failed to meet the represented profit levels from before the HMA, but also has fallen short of profits that Owner achieved in 2022 *without a hotel manager*. In other words, Highgate's impact on the Biltmore Hotel's business has been decidedly *negative* compared to historical levels. In addition, Biltmore Owner has uncovered unauthorized expenditures and excessive spending made by Highgate without Biltmore Owner's express consent (as was required).

14.     Pursuant to the HMA, on June 30, 2023, Biltmore Owner provided Highgate with a notice of default with a thirty-day cure period. Highgate refused to cure any of the defaults, and presented no plan to turn around the profitability of the Biltmore Hotel. Highgate also refused to turn over or reimburse funds that it transferred without authority.

15.     Accordingly, Biltmore Owner terminated the HMA on August 3, 2023. In the notice, Biltmore Owner demanded return of the Biltmore Hotel premises and agreement that Highgate would immediately begin transitioning the Biltmore Hotel back to Biltmore Owner.

16.     However, Highgate has not accepted the termination and, instead, remains in possession and control of the Biltmore Hotel and Plaintiffs' real property, personal property, bank accounts, financial records, and intellectual property.

17.     Accordingly, Plaintiffs bring this Complaint, which solely seeks injunctive and emergency relief, to prevent actual and imminent violations of Plaintiffs' rights.[1]

18.     This Complaint asserts seven counts: Count I (Declaratory Judgment that Biltmore Owner terminated Highgate's agency); Count II (Declaratory Judgment that the HMA has been terminated); Count III (Declaratory Judgment that Highgate cannot enforce the HMA against Biltmore Owner); Count IV (Lanham Act Violation); Count V (Trespass); Count VI (Conversion); and Count VII (Claims for Specific Performance).

---

[1] Section 23.2 of the HMA requires that the "Parties shall reserve all disputes that may arise in connection with this Agreement through final and binding arbitration…" However, there is an exception to the arbitration clause under Section 23.3.7 of the HMA for claims seeking "emergency or injunctive relief." Accordingly, Biltmore Owner is seeking only the remedies of injunctive and emergency relief in this forum, and is proceeding with its claims for damages and other remedies in the arbitration.

## PARTIES, JURISDICTION AND VENUE

19.     Biltmore Owner is a limited liability company incorporated under the laws of Delaware with its principal place of business located at 145 West 44th Street, New York, New York.

20.     The Registrant is a company incorporated under the laws of Singapore, with its principal place of business located in Singapore.

21.     Highgate is a limited partnership incorporated under the laws of Delaware, with its principal place of business located at 870 7th Avenue, 2nd Floor, New York, New York, which is the location of its principals Mahmood Khimji and Mehdi Khimji, Highgate's co-founders and co-chairmen of the board.

22.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331, as the underlying civil action involves claims arising under the Lanham Act (15 U.S.C. § 1114(1)(a)), and the Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over the state law claims asserted herein because they form part of the same case and controversy as the events underlying the Lanham Act claim.

23.     This Court has personal jurisdiction over Highgate because Highgate has its principal place of business in New York, and this case arises from a contract governed under New York law.

24.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1), as the defendant Highgate's principal place of business is located in the Southern District of New York.

## BACKGROUND FACTS

25.     The Biltmore Owner is the entity that owns the Biltmore Hotel.

26.     The Biltmore Owner's parent company – Millennium & Copthorne Hotels Limited ("Millennium") – owns multiple luxury hotels across the country and around the world under the Millennium brand name.

27.     The Registrant owns the licensed trademarks "Millennium Biltmore Hotel" (Registration Number 5189857) and the "M" logo (Registration Number 5484698) which are registered with the United States Patent and Trademark Office ("USPTO"), as well as "The Biltmore" (serial number 97769018) which has been submitted to the USPTO. The Registrant also owns other trademarks relating to Millennium and/or the Biltmore Hotel, including logo, word, and design marks. Millennium is the beneficial owner of these trademarks.

28.     Highgate is a company that manages and operates hotels across the country.

**I.      Highgate Induces the Biltmore Owner to Enter into the HMA**

29.     At some point in 2022, Highgate approached officers at Millennium and Biltmore Owner regarding a possible hotel management agreement whereby Highgate would operate the Biltmore Hotel.

30.     At that time, Highgate operated several hotels for Millennium that were all located in New York, New York.

31.     As the parties began discussions in earnest towards entering into a possible hotel management agreement, the parties entered a period of due diligence.

32.     During this period, Highgate requested detailed financial documents relating to the Biltmore Hotel; all of which was provided by the Biltmore Owner.

33.     Specifically, on May 19, 2022, Matthew Wechsler at Highgate sent an email seeking the following documents relating to the Biltmore Hotel:

"1.     STAR Reports
        a.     Dec 2017

       b.       Dec 2018
       c.       Dec 2019
       d.       Dec 2020
       e.       Dec 2021
       f.       April 2022 (March 2022 if April is not ready yet)

2.       Full detailed P&L with departmental breakout and wages and hours worked / FTE detail
       a.       Dec 2017 actuals
       b.       Dec 2018 actuals
       c.       Dec 2019 actuals
       d.       Dec 2020 actuals
       e.       Dec 2021 actuals
       f.       YTD April 2022 actuals

3.       Detailed P&L by month / spread view
       a.       2022 budget
       b.       2022 reforecast with actuals through April

4.       Org Chart

5.       Wage Roster that has position and salary / hourly wage."

34.      Over the next few days, the Biltmore Owner responded by sending the requested materials to Highgate.

35.      During the due diligence period, the Biltmore Owner provided Highgate with all the information and documentation Highgate requested for preparing its pro forma financial statements.

36.      On or about June 10, 2022, Richard Russo, a principal from Highgate, sent Biltmore Owner the pro forma financial statements that Highgate prepared regarding the potential hotel management agreement for Highgate to operate the Biltmore Hotel. The pro forma financial statements represented the expected financial impact of Highgate's operation of the Biltmore Hotel.

37.      In his email sending over the pro forma financial statements Mr. Russo wrote: "We've toured a number of the hotels here. Please see the attached LOI for the portfolio along

with our underwriting on the first five assets. After reviewing the numbers, we have identified opportunities with topline through our best practices in revenue management and distribution, as well as expenses through a strategical implementation of a synergized staffing model and reduction in operating expenses through Highgate's scale. Without question, across the portfolio, even before a renovation, we see significant upside opportunity."

38.     Highgate's pro forma financial statements estimated that if the Biltmore Owner entered into a hotel management agreement to allow Highgate to operate the Biltmore Hotel, then the gross operating profit for the Biltmore Hotel for year end 2023 would be $14,621,000, year end 2024 would be $19,021,000, and year end 2025 would be $21,471,000; whereas in year end 2021, the Biltmore's gross operating profit was $7,116,000, and its forecasted year end 2022 gross operating profit was $7,993,566.

39.     In addition, Highgate's pro forma financial statements estimated that if the Biltmore Owner entered into the HMA to allow Highgate to operate the Biltmore Hotel, then the Biltmore Hotel's EBITDA for year end 2023 would be $10,353,000, year end 2024 would be $13,836,000, and year end 2025 would be $15,824,000; whereas in year end 2021, Biltmore's EBITDA was $3,747,000, and its forecasted year end 2022 EBITDA was $7,141,000.

40.     The pro forma financial statements did not envision any ramp up period by Highgate, but instead assured the Biltmore Owner that Highgate would substantially increase gross operating profit and EBITDA in the first year of Highgate's operations of the Biltmore Hotel.

41.     After receiving the pro forma financial statements, the Biltmore Owner did its own independent analysis and stress test of the figures contained in the pro forma financial statements.

42.     In addition, the Biltmore Owner compared the pro forma financial statements that Highgate had prepared for Millennium's New York hotels (prior to managing them for Millennium) with the actual results Highgate achieved operating the hotels in New York.  This analysis showed that Highgate had reasonably achieved the results in its New York pro forma financial statements with the New York hotels.

43.     Based on these facts, the Biltmore Owner reasonably believed Highgate could achieve the financial representations contained in its pro forma financial statements, given Highgate's prior management of the New York hotels for Millennium, the representations from Mr. Russo, and because Highgate had been provided with all of the financial documents it requested relating to the Biltmore Hotel.

44.     Moreover, following up from the delivery of the pro forma financial statements, the parties had a meeting on or about October 6, 2022. During this meeting, Highgate representatives assured representatives from Biltmore Owner that if Highgate was operating the Biltmore Hotel, it could "easily" increase performance by "at least ten percent (10%)."

45.     Ultimately, the Biltmore Owner had been operating the Biltmore Hotel for years, and the decision whether to enter into the HMA was based on what it believed were the reasonable assurances from Highgate that it could operate the Biltmore Hotel more effectively with better profit. Without these assurances, Biltmore Owner would never have entered into the HMA.

46.     In reasonable reliance on Highgate's representations regarding the expected financial impact of Highgate's operations of the Biltmore Hotel and the representations made by Highgate officials, Biltmore Owner entered into the HMA with Highgate.

47.     At the time the pro forma financial statements and the representations were made, Highgate knew, or reasonably should have known, that the representations it had made regarding the expected financial impact of Highgate's operations were materially false.

48.     At the time the pro forma financial statements were issued and the representations were made, Highgate had no reasonable plan or goal to realize the gross operating profit and EBITDA figures that were contained in the pro forma financial statements and were used to induce the Biltmore Owner to enter into the HMA.

49.     Further, at the time the pro forma financial statements were issued, Highgate did not have the necessary staff or abilities to meet the representations contained in the pro forma financial statements.

## II.     Highgate Begins Operating the Biltmore Hotel Prior to Executing the HMA

50.     On or about November 1, 2022, Highgate began operating the Biltmore Hotel for the Biltmore Owner pursuant to an Asset Management Agreement ("**AMA**") between the parties.

51.     During this time, Highgate had full access to all of the Biltmore Hotel's financial and performance information.

52.     At no point between November 1, 2022 and when the HMA was executed on January 6, 2023 did Highgate ever revise any of the figures presented in its June 2022 pro forma financial statements, or communicate that the results in the pro forma financial statements were no longer achievable.

## III.     The Terms of the HMA between Biltmore Owner and Highgate

53.     On or about January 6, 2023, Biltmore Owner and Highgate entered into the HMA. As detailed below, the terms of the HMA imposed numerous obligations on Highgate.

**A.      Highgate Receives License to Use Millennium Brand**

54.      Section 14.1.2 of the HMA states that "Owner hereby grants to [Highgate], during the Term, a non-exclusive license to use Owner's IP in connection with the operation of the Hotel pursuant to this Agreement."

55.      Section 14.1.3 of the HMA states: "[Highgate] shall not have any right to use the Owner's IP in connection with the advertising, marketing and promotion of the Hotel, and [Highgate] ***shall cease using the Owner's IP, or holding itself out as being affiliated with the Hotel, promptly upon termination of this Agreement*** for any reason." (Emphasis added).

56.      "Owner's IP" is defined under the HMA as the "IP to the extent the same relates to a Brand that is owned by Owner or Owner's Affiliate."

57.      "IP" is defined under the HMA as: "(i) all trademarks, trade names, service marks and copyrights associated with the Brand and the related marks, logos and symbols that include the Brand, (ii) the right to use any and all slogans, derivations, trade secrets, know-how and trade dress and all other proprietary rights associated with the Brand, and (iii) the Brand Standards and all copyrights associated therewith."

58.      "Brand" is defined under the HMA as: "'M SOCIAL'[2] brand owned by Owner or its Affiliate ***or such other hotel brand, of Owner (or its Affiliate) or third-party franchisor or licensor, as the Parties may agree from time to time during the Term***." (Emphasis added).

59.      The parties agreed to operate the Biltmore under the "Millennium Biltmore Hotel," the "M" logo, and "The Biltmore" Brands, which are the trademarks of Registrant, a related entity of Biltmore Owner.

---

[2] The reference to "M Social" appears to be a scrivener's error. Millennium and Highgate have a separate hotel management agreement for Highgate to operate the M Social hotel for Millennium in New York. The M Social brand is not used at the Biltmore.

**B.     Highgate Must Use "Commercially Reasonable" and "Good Faith" Efforts to Maximize Profitability at the Biltmore Hotel**

60.     Under Section 2.1 of the HMA, "[Highgate] agrees to supervise and direct the management, operation and all aspects of the Hotel as a full service hotel under the Brand (if any) in accordance with the terms and conditions" of the HMA.

61.     Section 2.1 of the HMA further provides: "[Highgate] shall use commercially reasonable, good faith efforts to operate the Hotel in such a manner so as to maximize the profitability of the Hotel over the long-term . . ."

62.     Thus, Highgate was obligated under the HMA to use "commercially reasonable" and "good faith" efforts to "maximize the profitability" of the Biltmore Hotel.

**C.     Highgate Must Develop Comprehensive Plan for Operating the Biltmore Hotel and Controlling Spending**

63.     Section 10.4.1 of the HMA requires Highgate to prepare a "Transition Budget and Plan," which had to detail the "budget and plan specifying the Transition Costs anticipated to be incurred by [Highgate] and activities to be performed by [Highgate] in order to complete the Transition."

64.     Thus, from the outset of the HMA, Highgate was obligated to prepare a Transition Plan to ensure the orderly and effective transition of the Biltmore Hotel's operations to Highgate.

65.     Further, the HMA required Highgate to prepare a detailed Annual Plan for its operations of the Biltmore Hotel, which was subject to the Owner's review and approval.

66.     Section 10.1 of the HMA provides that: "sixty (60) days following the Commencement Date . . . [Highgate] shall provide a proposed annual plan to Owner for the next Operating Year. Each proposed annual plan shall contain reasonably detailed revenue and expense projections, including Capital Expenditures and [Highgate's] recommended facilities

13

compliance project expenses, projected Management Fees, Centralized Services Charges and Reimbursable Expenses, staffing plan and sales and marketing plans for the ensuring year (collectively, the 'Annual Plan')."

67.     Section 10.2 of the HMA further provides that the "Owner shall have the right to approve or disapprove, as applicable, the proposed Annual Plan, which approval shall not be unreasonably withheld, conditioned, or delayed."

68.     Section 10.3 also states that: "[Highgate] shall use reasonable efforts to operate the Hotel in accordance with the approved Annual Plan."

69.     In addition to the "Transition Budget and Plan," and the "Annual Plan," the HMA also required Highgate to prepare other plans monitoring its spending at the Biltmore Hotel.

70.     For example, Section 5.2 of the HMA required Highgate to notify the Owner on a monthly basis of all "complimentary and/or discounted privileges" provided to Highgate's Corporate Personnel "with respect to Hotel guest rooms and other amenities and facilities within the Hotel."

**D.      The Biltmore Owner Must Approve Any Excess Spending**

71.     The terms of the HMA strictly limit Highgate's spending in its operations of the Biltmore Hotel.

72.     Section 10.3 of the HMA states that: "[Highgate] shall not, without Owner's prior approval . . . incur costs or expenses or make expenditures exceeding: (A) any departmental line item provided for in the Annual Plan by more than ten percent (10%); or (B) the aggregate amount of expenditures provided for in the Annual Plan by more than five percent (5%)."

73.     Further, Section 5.1 of the HMA provides that all Centralized Services Charges are for services that are "provided" to the hotel and "shall … be included in the Annual Plan to be approved by Owner pursuant to Article 10."

74.     In addition, Section 5.1 of the HMA states that the "Centralized Services Charges shall … not include any profit or mark-up to Operator."

**E.     Highgate's Richard Russo Must Actively Provide Oversight of the Biltmore**

75.     As part of the HMA, the parties agreed that Highgate principal Richard Russo would play a critical role in operating the Biltmore Hotel.

76.     Specifically, Section 12.5 of the HMA states: "Richard Russo … shall be active in providing [Highgate] oversight of the Hotel."

**F.     HMA's Default Provisions Allow Owner to Terminate after 30 Days' Notice If Highgate Materially Breaches the HMA**

77.     Section 19.1 of the HMA details what actions constitute an "Event of Default."

78.     Section 19.1.1 of the HMA states that the "failure of either Party to make any payment to the other as provided for herein . . . and such failure shall continue for ten (10) days after written demand thereof is delivered by the non-defaulting Party," constitutes an Event of Default.

79.     Section 19.1.2 of the HMA provides that the "failure of either Party to keep, observe, or perform any of the other material covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of such default for a period of thirty (30) days after written notice thereof is delivered by the non-defaulting Party…" constitutes an Event of Default.

80.     Section 19.2 of the HMA provides that "[i]n the event of an Event of Default, the non-defaulting Party shall have the right, in addition to any and all other rights and remedies

available to such non-defaulting Party under Legal Requirements or in equity, including, without limitation, the ability to collect damages to terminate this Agreement."

81.     Moreover, Section 22.1 of the HMA provides that "[u]pon any termination of this Agreement, [Highgate] shall cooperate with Owner … to accomplish an orderly and expeditious transition of management functions to Owner or its new manager…"

82.     Section 22.1 of the HMA enumerates a list of Highgate's duties included with this obligation.

**IV.     Highgate Materially Breached the HMA Shortly After Taking Over the Biltmore**

83.     Soon after Highgate began operating the Biltmore Hotel pursuant to the HMA, Highgate materially breached the HMA by failing to prepare a plan for the Biltmore Hotel to meet the financial impacts on the Biltmore Hotel's operations that Highgate represented in its pro forma financial statements. In addition, Highgate materially breached the HMA by failing to control spending, failing to staff key positions at the Biltmore Hotel, and by failing to operate the hotel in a commercially reasonable and good faith manner in order to maximize profits.

84.     Indeed, in April 2023, Highgate presented Biltmore Owner with a budget that departed, significantly, from the pre-contractual representations which Biltmore Owner had relied upon before giving management of the Biltmore Hotel to Highgate.

85.     The new budget increased planned expenses, reduced planned revenue, and virtually eliminated the profit increase represented to Biltmore Owner before the execution of the HMA.

86.     Highgate was unable to explain what had changed to cause these revisions, nor why these figures were not shared ***before*** the execution of the HMA.

87.     The Biltmore Owner rejected Highgate's arbitrary attempt to shift its goalposts, and demanded that Highgate present a budget that conformed with the pro forma financial statements.

88.     Highgate failed to ever present a conforming budget as required. In addition, as set forth below, Highgate breached numerous provisions of the HMA.

**A.     Highgate Fails to Exercise Commercially Reasonable and Good Faith Efforts to Maximize Profit at the Biltmore Hotel**

89.     Prior to the execution of the HMA, Highgate represented to the Owner, through its pro forma financial statements, that the Biltmore would earn gross operating profit of approximately $14,621,000 and EBITDA of $10,353,000 during the first year under Highgate's management.

90.     The Biltmore Owner relied upon these statements with the expectation that the numbers in the pro forma financial statements were: (i) derived from meaningful diligence, (ii) based upon an actual plan for achieving the figures contained therein, and (iii) premised upon the resources actually available to Highgate to execute such plan.

91.     Highgate's performance under the HMA, however, has been unacceptable under any metric, as Highgate has not come close to meeting the figures contained in its pro forma financial statements.

92.     In the first five months Highgate has managed the Biltmore Hotel (*i.e.*, February 2023 through June 2023), gross operating profit at the Biltmore Hotel has been $2,012,165, and EBITDA at the Biltmore Hotel was approximately ***negative*** $841,000.

93.     Further, Highgate's performance at the Biltmore Hotel is not only nowhere near its pro forma financial statements, but it also is lower than the performance at the Biltmore Hotel from the previous year when Biltmore Owner was managing the hotel.

94.     During Highgate's management, gross operating profit at the Biltmore Hotel has dropped $2,347,231 when compared to 2022, and EBITDA has dropped by approximately $1,474,000 compared to 2022.

95.     Highgate's results are nowhere near the figures contained in their pro forma financial statements. In fact, they are worse than the previous year when Highgate was not operating the Biltmore Hotel.  It is clear Highgate has failed and is failing to use commercially reasonable and good faith efforts to maximize profits at the Biltmore Hotel.

96.     Indeed, as detailed below, it is clear from Highgate's actions that it is not using commercially reasonable and good faith efforts to maximize profits at the Biltmore Hotel.

> **1.     Highgate Fails to Fill Key Positions at the Biltmore**

97.     Highgate has not hired competent employees for numerous key positions at the Biltmore Hotel. For instance:

> a)     The human resources director position has not been filled in the five months that Highgate has been managing the Biltmore Hotel.
>
> b)     The sales director position has been vacant for the past three months. Before then, the person Highgate appointed for the role, without Biltmore Owner's approval, as was required under the HMA, was subsequently fired for gross misconduct within two months of his hire date.
>
> c)     The director of food and beverages position has been vacant for over three months.
>
> d)     The housekeeping manager position has been vacant for over three months.

e)   The banquet manager position was vacant for over three months until recently, when an employee was finally hired for the role. However, the Biltmore Owner has since learned that this employee quit on the first day, so the position is, once again, vacant.

f)   The accounting manager in the finance department recently resigned, creating yet another key vacancy that Highgate must fill.

**2.   Highgate has Increased Spending and Lowered Profits from Key Areas of the Biltmore's Operations**

98.   Highgate has spent far in excess of any plausibly acceptable budget for the Biltmore Hotel, despite representing prior to signing the HMA that it would reduce operating expenses.

99.   For example, the data for food and beverage expenses reveal spending is out of control under Highgate.

100.   During 2022, the Biltmore Hotel historically earned roughly $700,000 a month in profit on food and beverage alone, in part due to low expense and high margins.

101.   However, under Highgate's management, food and beverage revenues have declined significantly while expenses have skyrocketed, ***virtually eliminating the profit opportunity for such sales***.  The following chart illustrates this problem:

|  | Revenue | Expenditure | % Excess | Profit | Profit Multiple |
|---|---|---|---|---|---|
| F&B    May 2022 | $1,368,875 | $654,481 | -- | $714,394 | ***34.75x*** |
| F&B    May 2023 | $999,426 | $921,817 | ***+40.84%*** | $20,558 | |

102.   As shown above, in May 2022 the Biltmore earned nearly 35 times what Highgate achieved in May 2023 in the critical food and beverage sector.

**B.      Richard Russo Fails to Actively Oversee the Biltmore**

103.    Despite the clear language in Section 12.5 of the HMA that Richard Russo "shall be active in providing [Highgate] oversight of the Hotel," he has not been involved in the operations at the Biltmore Hotel at all.

104.    To date, Richard Russo has never visited the Biltmore Hotel, and appears to have had no involvement, whatsoever, in overseeing its operations.

**C.      Highgate Fails to Prepare the Required Annual Plan for the Biltmore Hotel's Operations**

105.    Highgate is woefully delinquent in submitting critical components of the Annual Plan to the Biltmore Owner, including the plan for sales and marketing, as well as capital expenditures.

106.    Specifically, Highgate has ***not*** provided Biltmore Owner with the complete Annual Plan required under the HMA, despite the requirements of Section 10.1 of the HMA.

107.    While Highgate provided certain elements of a purported Annual Plan, Highgate did not provide critical supporting plans including the "sales and marketing plans" and the plan for "Capital Expenditures."

108.    Further, Highgate never obtained Biltmore Owner's approval of the Annual Plan, as required under Section 10.2 of the HMA.

109.    In addition, Highgate never prepared and has not provided Biltmore Owner with a Transition Plan for Biltmore Owner's review and approval as required under Section 10.4.1 of the HMA. Instead, Highgate only provided Biltmore Owner with a Transition Budget.

110.    Moreover, Highgate has failed to provide regular and consistent monthly reports to Biltmore Owner of all complimentary and discounted privileges that Highgate has extended to

its Corporate Personnel with respect to the Biltmore Hotel's guest rooms and other amenities, as required under Section 5.2 of the HMA.

> **D.      Highgate Has Incurred, and Continues to Incur, Unauthorized Expenses Without Biltmore Owner's Approval**

111.    Section 5.1 of the HMA provides that all Centralized Services Charges are for services that are "***provided***" to the hotel and "shall … be included in the Annual Plan ***to be approved by Owner*** pursuant to Article 10." (Emphasis added).

112.    Currently, the Biltmore Owner is incurring Centralized Services Charges for IT services that the Biltmore Hotel does not use.

113.    To date, the Biltmore Hotel continues to use Millennium's IT services, yet Highgate has imposed unauthorized IT charges for Highgate's own IT services even though the Biltmore Hotel does not use these IT services. And Biltmore Owner has not approved the charges levied by Highgate. Specifically, Highgate has charged Biltmore Owner for "licensing" fees, "firewall" fees, and "IT Service" fees; none of which the Biltmore Hotel uses, nor the Biltmore Owner has authorized.

114.    Biltmore Owner has calculated the total unauthorized IT Centralized Service Charges billed to Biltmore Owner, to date, to be $52,336.

115.    In addition, Section 5.1 of the HMA states that the "Centralized Services Charges shall … not include any profit or mark-up to [Highgate]."

116.    The $52,336 billed, to date, for IT Centralized Services Charges clearly represent "profit or mark-up" because the Biltmore Hotel does not use these services.

117.    Further, Section 10.3 of the HMA states that: "[Highgate] shall not, without Owner's prior approval . . . incur costs or expenses or make expenditures exceeding: (A) any departmental line item provided for in the Annual Plan by more than ten percent (10%); or (B)

the aggregate amount of expenditures provided for in the Annual Plan by more than five percent (5%)."

118.    The expenditures for numerous departmental line items are significantly over ten percent (10%) of the amounts contained in Highgate's budget that was presented in its (rejected) partial April 2023 Annual Plan.

119.    Food and Beverage expenses, for example, are trending in the wrong direction.

120.    In February 2023, Highgate had $689,663 in food and beverage expenses. This increased to $845,445 in March 2023. In April 2023, Highgate had $841,281 in food and beverage expenses, which was fourteen percent (14%) over Highgate's budgeted April 2023 food and beverage expenses of $739,305. The following month was even worse, as Highgate had $921,817 in food and beverage expenses in May 2023. This was twenty-three percent (23%) over Highgate's budgeted May 2023 Food and Beverage expenses of $749,192.

121.    Food and beverage is not the only departmental line item where Highgate has incurred costs significantly over ten percent (10%) of the amounts in Highgate's most recent budget. Additional examples of *significantly higher expenditures*, for the period from February 2023 to May 2023, include:

    a)    Laundry and dry cleaning expenditures are 19.6% over their budgeted costs.

    b)    Group commission expenditures are 12.5% over their budgeted costs, even though group revenue is down.

    c)    Reservations expenditures are 16.5% over their budgeted costs.

    d)    Linen expenditures are 326.5% over their budgeted costs.

    e)    Valet expenses expenditures are 16.2% over their budgeted costs.

      f)     Contract services expenditures are 101.4% over their budgeted costs.

      g)     Promotion expenditures are 265.5% over their budgeted costs.

122.    The above are just some examples of a chronic problem. They illustrate clearly that Highgate has failed to reign in its excessive spending and comply with its budget.

123.    In addition, Highgate has overburdened the Biltmore Hotel with unreasonable overhead expenses.

124.    In three of the four months that Highgate has operated the Biltmore Hotel, undistributed expenses have exceeded Highgate's proposed budget by well more than five percent (5%).

125.    These are the figures for the relevant months: February 2023 – 6.78%; March 2023 – 12.61%; and May 2023 – 14.25%.

**E.    Highgate is Actively Damaging Owner's Reputation and Brand**

126.    Highgate's management of the Biltmore Hotel has also actively threatened the Biltmore Owner's reputation in the marketplace, and among key suppliers and vendors.

127.    For instance, Highgate's negligence has resulted in non-payment to critical vendors.  Invoices past due more than 120 days are still unpaid.

128.    Vendors have expressed their serious concerns with this conduct, and Biltmore Owner is concerned that many long-time suppliers may cease doing business with Biltmore Owner or will do so only on less favorable terms.

129.    In addition, there has also been a rash of libelous, derogatory communications from Highgate management regarding the Biltmore Owner's management of the Biltmore Hotel and the acumen and character of the Biltmore Owner's corporate and other staff members.

130.    As an example, when Highgate failed to properly manage and operate the Biltmore Hotel's annual Mother's Day event, which led to numerous complaints from customers of poor management, representatives from the Biltmore Owner spoke with representatives of Highgate about the incident.

131.    Rather than accept responsibility for its own shortcomings, Highgate's representatives blamed the entire event's failures on a single member of the staff at the Biltmore Hotel.

132.    Highgate has flaunted its duty to act as an ambassador for the Millennium brand in service, but at the same time it has sought to avoid accountability for its own failures.

**V.    Biltmore Owner Provides Notice of Default and Terminates the HMA**

133.    On June 30, 2023, Biltmore Owner provided notice of Events of Default to Highgate pursuant to Section 19.1 of the HMA.

134.    In the June 30, 2023 correspondence, Biltmore Owner expressly wrote: "**To avoid all doubt, pursuant to Section 19.1.2 of the HMA, if any breaches identified herein remain uncured after thirty (30) days from the date of this letter, then an Event of Default will have occurred and the Owner reserves its rights under Section 19.2 of the HMA to immediately terminate the HMA, as well as reserves its rights to exercise any and all other remedies available**." (Emphasis in original).

135.    Following issuance of the letter, Highgate has failed and/or refused to take any action to cure any of the defaults detailed in the June 30, 2023 correspondence.

136.    As a result, on August 3, 2023, Biltmore Owner terminated the HMA between the parties under Section 19.2 of the HMA.

137.     This correspondence required Highgate to immediately confirm its acknowledgment that the HMA had been terminated and its representation that it would begin complying with Section 22.1 of the HMA to transition the operations of the Biltmore Hotel back to Biltmore Owner.

138.     However, Highgate has not acknowledged that the HMA is terminated, and has not started cooperating in the immediate and effective transition of operations of the Biltmore Hotel back to Biltmore Owner pursuant to Section 22.1 of the HMA.

139.     As a result, Biltmore Owner has no choice but to seek immediate emergency relief from this Court.

## COUNT I

### DECLARATORY JUDGMENT THAT BILTMORE OWNER HAS REVOKED HIGHGATE'S AGENCY OVER THE BILTMORE HOTEL
### (28 U.S.C. § 2201(a))

140.     Biltmore Owner incorporates by reference the allegations in Paragraphs 1 through 139 as if fully set forth herein.

141.     There exists an actual and substantial controversy between Biltmore Owner and Highgate. Both parties have adverse legal interests against the other, regarding whether Biltmore Owner has properly terminated Highgate's agency over the Biltmore Hotel.

142.     Highgate denies that Biltmore Owner has terminated its agency over the Biltmore Hotel. It takes the position that it can retain possession and control of the Biltmore Hotel and Biltmore Owner's bank accounts, financial records, employees, and all other operational information pursuant to the HMA; as well as continue to use the Registrant's trademarks relating to the Biltmore Hotel.

143.    Biltmore Owner, however, has revoked Highgate's agency relationship over the Biltmore Hotel. A principal has the absolute power to terminate the agency relationship at any time, irrespective of the HMA.

144.    In New York, the general rule is that the principal has the power to revoke the agency, even if it breaches the parties' applicable contract. Furthermore, under the law, a principal has the power to revoke, at any time, its agent's authority to represent the principal.

145.    Additionally, according to the Restatement (Third) Of Agency § 3.10: "Notwithstanding any agreement between principal and agent, an agent's actual authority terminates if the agent renounces it by a manifestation to the principal or if the principal revokes the agent's actual authority by a manifestation to the agent. A revocation or a renunciation is effective when the other party has notice of it."

146.    Biltmore Owner revoked Highgate's agency over the Biltmore Owner on August 3, 2023.

147.    As a result, effective immediately, Highgate has no authority to remain in custody or control of the Biltmore Hotel, or of the property belonging to Plaintiffs.

148.    However, Highgate has not acknowledged the termination of the agency relationship and has not relinquished custody and control over the Biltmore Hotel or the Biltmore Owner's bank accounts, financial and operational information, employee information, and all other assets it currently has access to and control over as agent; as well as has not ceased using the Millennium Biltmore Hotel trademark, the "M" logo trademark, The Biltmore trademark, and all other trademarks relating to Millennium or the Biltmore Hotel.

WHEREFORE, Biltmore Owner respectfully requests a declaratory judgment in its favor and against Highgate finding that Biltmore Owner has properly terminated the agency

relationship between Biltmore Owner and Highgate; as well as entry of emergency injunctive relief of an order enjoining Highgate from exercising possession, custody, or control over the Biltmore Hotel and any personal property, real property, intellectual property, bank accounts, or other tangible property belonging to Biltmore Owner; enjoining Highgate from using the Millennium Biltmore Hotel, the "M" logo, The Biltmore, or any other trademarks relating to Millennium or the Biltmore Hotel, or holding itself out as being affiliated with the Biltmore Hotel; enjoining Highgate from interfering with or exercising control over employees of the Biltmore Hotel, including without limitation any act to interfere with notice to unionized employees at the Biltmore Hotel that Biltmore Owner is a successor employer; requiring Highgate to immediately begin the orderly and expeditious transition of management functions of the Biltmore Hotel to Biltmore Owner pursuant to Section 22.1 of the HMA; as well as granting such other and further relief as this court deems just and appropriate.

## COUNT II

### DECLARATORY JUDGMENT THAT BILTMORE OWNER PROPLERLY TERMINATED THE HMA PURSUANT TO SECTION 19.2 OF THE HMA (28 U.S.C. § 2201(a))

149.   Biltmore Owner incorporates by reference the allegations in Paragraphs 1 through 139 above, and 159-162 below, as if fully set forth herein.

150.   There exists an actual and substantial controversy between Biltmore Owner and Highgate. Both parties have adverse legal interests against the other regarding whether Biltmore Owner has properly terminated the HMA between the parties pursuant to Section 19.2 of the HMA.

151.   Highgate denies that Biltmore Owner has terminated the HMA, and takes the position that it can retain possession and control of the Biltmore Hotel and Biltmore Owner's

bank accounts, financial records, employees, and all other operational information; as well as continue to use the Millennium Biltmore Hotel trademark, the "M" logo trademark, The Biltmore trademark, and any other trademarks relating to Millennium or the Biltmore Hotel.

152.    Biltmore Owner, however, has effectively terminated the HMA pursuant to Section 19.2 by providing the requisite notice, under Section 19.1 of the HMA, to Highgate. Specifically, Biltmore Owner gave notice of default on June 30, 2023, and Highgate refused to cure (or attempt to cure) any of the defaults within thirty (30) days.

153.    As a result, on August 3, 2023, Biltmore Owner properly terminated the HMA pursuant to Section 19.2 of the HMA.

154.    Yet, Highgate has not acknowledged the termination, has not relinquished custody and control over Plaintiffs' property, and has not begun transitioning the operations of the Biltmore Hotel back to Biltmore Owner pursuant to Section 22 of the HMA; thereby causing irreparable harm to Biltmore Owner.

WHEREFORE, Biltmore Owner respectfully requests a declaratory judgment in its favor and against Highgate finding that Biltmore Owner has properly terminated the HMA pursuant to Section 19.2 of the HMA, as well as entry of emergency injunctive relief of an order enjoining Highgate from exercising possession, custody, or control over the Biltmore Hotel and any personal property, real property, intellectual property, bank accounts, or other tangible property belonging to Biltmore Owner; enjoining Highgate from using the Millennium Biltmore Hotel, the "M" logo, The Biltmore, or any other trademarks relating to Millennium or the Biltmore Hotel, or holding itself out as being affiliated with the Biltmore Hotel; enjoining Highgate from interfering with or exercising control over employees of the Biltmore Hotel, including without limitation any act to interfere with notice to unionized employees at the Biltmore Hotel that

Biltmore Owner is a successor employer; requiring Highgate to immediately begin the orderly and expeditious transition of management functions of the Biltmore Hotel to Biltmore Owner pursuant to Section 22.1 of the HMA; as well as granting such other and further relief as this court deems just and appropriate.

## COUNT III (PLED IN THE ALTERNATIVE)
## DECLARATORY JUDGMENT THAT HIGHGATE
## CANNOT ENFORCE THE HMA AGAINST BILTMORE OWNER
## (28 U.S.C. § 2201(a))

155.    Biltmore Owner incorporates by reference the allegations in Paragraphs 1 through 139 as if fully set forth herein.

156.    There exists an actual and substantial controversy between Biltmore Owner and Highgate, pursuant to which both have adverse legal interests against the other, in regards to whether Highgate can enforce the HMA against Biltmore Owner.

157.    Highgate takes the position that it can enforce the HMA against Biltmore Owner as a means to retain possession and control of the Biltmore Hotel and Biltmore Owner's bank accounts, financial records, employees, and all other operational information; as well as continue to use the Millennium Biltmore Hotel trademark, the "M" logo trademark, The Biltmore trademark, and any other trademarks relating to Millennium or the Biltmore Hotel.

158.    Highgate, however, cannot seek to enforce the HMA because: (a) it has committed material breaches of the HMA; (b) it fraudulently induced Biltmore Owner to enter into the HMA; and (c) the HMA was a product of unilateral mistake by Biltmore Owner.

**Material Breach**

159.    Highgate materially breached the HMA, so Highgate has no right to subsequently enforce any of its rights under the contract due to its prior material breach.

160.    As detailed herein, Highgate breached the HMA by failing to perform all of its obligations under the HMA. Highgate's breaches include, but are not limited to, the following:

a)      Breaching Section 14.1.3 of the HMA by continuing to use the Millennium Biltmore Hotel, the "M" logo, The Biltmore, and all other trademarks relating to Millennium and/or the Biltmore Hotel, and by continuing to hold itself out as being affiliated with the Biltmore Hotel despite Biltmore Owner terminating the HMA.

b)      Breaching Section 2.1 of the HMA by failing to use "commercially reasonable" and "good faith efforts" to operate the Biltmore Hotel "in such a manner so as to maximize the profitability of the Hotel over the long-term . . ."

c)      Breaching Section 12.5 of the HMA by failing to have Richard Russo actively involved in providing Highgate with oversight of the Biltmore Hotel and its operations.

d)      Breaching Sections 10.1, 10.2, and 10.3 of the HMA by failing to prepare the Annual Plan required under the HMA, failing to obtain Biltmore Owner's approval of the Annual Plan as required under the HMA, and failing to abide by an approved Annual Plan as required under the HMA.

e)      Breaching Section 5.2 of the HMA by failing to notify Biltmore Owner, on a monthly basis, of all "complimentary and/or discounted privileges" provided to Highgate's corporate personnel "with respect to Hotel guest rooms and other amenities and facilities within the Hotel."

f)      Breaching Section 10.4.1 of the HMA by failing to provide a Transition Plan to Biltmore Owner.

g)       Breaching Section 5.1 of the HMA by charging $52,336 in IT Centralized Services Charges for services Biltmore Owner never approved and which the Biltmore Hotel does not use.

h)       Breaching Section 10.3 of the HMA by incurring costs, expenses, and expenditures that exceed departmental line items in the Annual Plan by more than ten percent (10%) and/or by exceeding the aggregate amount of expenditures provided for in the Annual Plan by more than five percent (5%).

161.    Biltmore Owner has been damaged by Highgate's breaches; which include, but are not limited to, the amount of unauthorized excessive costs incurred by Highgate, lost profits, reputational damage, and loss of goodwill.

162.    Therefore, Highgate has committed a prior material breach, which further bars Highgate from seeking to enforce the HMA against Biltmore Owner.

**Fraudulent Inducement**

163.    The HMA is unenforceable against Biltmore Owner because of Highgate's fraudulent inducement of the Biltmore Owner to enter into the HMA.

164.    Highgate's pro forma financial statements represented that if Biltmore Owner entered into a hotel management agreement to allow Highgate to operate the Biltmore Hotel, then the Biltmore Hotel's gross operating profit for the year end 2023 would be $14,621,000, year end 2024 would be $19,021,000, and year end 2025 would be $21,471,000; whereas in year end 2021, the Biltmore Hotel's gross operating profit was $7,116,000, and its forecasted year end 2022 gross operating profit was $7,993,566.

165.    In addition, Highgate's pro forma financial statements stated that if Biltmore Owner entered into the HMA to allow Highgate to operate the Biltmore Hotel, then the Biltmore

Hotel's EBITDA for year end 2023 would be $10,353,000, year end 2024 would be $13,836,000, and year end 2025 would be $15,824,000; whereas in year end 2021, Biltmore Hotel's EBITDA was $3,747,000, and its forecasted year end 2022 EBITDA was $7,141,000.

166.    Also, on June 10, 2022, Highgate's Richard Russo wrote to Biltmore Owner: "We've toured a number of the hotels here. Please see the attached LOI … along with our underwriting … After reviewing the numbers, we have identified opportunities with topline through our best practices in revenue management and distribution, as well as expenses through a strategical implementation of a synergized staffing model and reduction in operating expenses through Highgate's scale. Without question, across the portfolio, even before a renovation, we see significant upside opportunity."

167.    Furthermore, on or about October 6, 2022, representatives from Biltmore Owner met with representatives from Highgate. During this meeting, representatives from Highgate gave assurances that if the Biltmore Hotel was transferred to Highgate, Highgate could "easily" improve performance by at least ten percent (10%).

168.    As detailed herein, these representations were materially false, misleading, and/or made without a reasonable basis to believe they were true.

169.    Highgate made these misrepresentations to Biltmore Owner with the intent to defraud Biltmore Owner and/or with reckless disregard as to the truth of the statements.

170.    Highgate's intent in making the fraudulent statements was to induce Biltmore Owner to enter into the HMA.

171.    Biltmore Owner reasonably relied on these representations to its detriment by agreeing to enter into the HMA.

172.    Biltmore Owner signed the HMA because it reasonably believed Highgate could achieve the financial impact on the Biltmore Hotel's operations that Highgate represented it could achieve in the pro forma financial statements, which would have improved the financial profitability of the Biltmore Hotel more so than if the Biltmore Owner continued to run the hotel on its own.

173.    However, these representations were materially false.

**Biltmore Owner's Unilateral Mistake**

174.    Biltmore Owner entered into the HMA under a mistake of fact; specifically, that Highgate had adequate staffing, planning, and ability to reasonably achieve the results contained in its pro forma financial statements.

175.    Highgate knew, or reasonably should have known, that such a mistake was being made because it was the party making these representations when it knew, the entire time, that it did not have the staffing, planning, or ability to meet the representations contained in the pro forma financial statements.

176.    As a result, the HMA is void and unenforceable.

WHEREFORE, Biltmore Owner respectfully requests a declaratory judgment in its favor and against Highgate finding that the HMA is no longer enforceable, as well as emergency injunctive relief of an order rescinding the HMA; enjoining Highgate from exercising possession, custody, or control over the Biltmore Hotel and any personal property, real property, intellectual property, bank accounts, or other tangible property belonging to Biltmore Owner; enjoining Highgate from using the Millennium Biltmore Hotel, the "M" logo, The Biltmore, or any other trademarks relating to Millennium or the Biltmore Hotel, or holding itself out as being affiliated with the Biltmore Hotel; enjoining Highgate from interfering with or exercising control

over employees of the Biltmore Hotel, including without limitation any act to interfere with notice to unionized employees at the Biltmore Hotel that Biltmore Owner is a successor employer; requiring Highgate to immediately begin the orderly and expeditious transition of management functions of the Biltmore Hotel to Biltmore Owner; as well as granting such other and further relief as this court deems just and appropriate.

## COUNT IV

### TRADEMARK INFRINGEMENT IN VIOLATION OF THE LANHAM ACT (15 U.S.C. § 1114(1)(a))

177.    The Registrant incorporates by reference the allegations in Paragraphs 1 through 139 as if fully set forth herein.

178.    The Registrant owns the trademarks "Millennium Biltmore Hotel" (Registration Number 5189857) and the "M" logo (Registration Number 5484698) which are registered with the USPTO, as well as "The Biltmore" (Serial Number 97769018) which has been submitted to the USPTO.

179.    The Registrant also owns other trademarks relating to Millennium and/or the Biltmore Hotel, including logo, word, and design marks.

180.    Under Section 14.1.2 of the HMA, Highgate was granted a "non-exclusive license" to use the Millennium Biltmore Hotel, the "M" logo, and The Biltmore trademarks, as well as other trademarks relating to the Millennium and/or the Biltmore Hotel "in connection with the operation of the [Biltmore] pursuant to this [HMA]."

181.    Under Section 14.1.3 of the HMA, Highgate "***shall cease using the [Millennium Biltmore Hotel, the "M" logo, The Biltmore, and other trademarks relating to the Millennium and/or the Biltmore Hotel] or holding itself out as being affiliated with the Hotel, promptly upon termination of this Agreement*** for any reason." (Emphasis added).

182.   Biltmore Owner terminated the HMA on August 3, 2023. Therefore, as of that date, Highgate had no license to use any of the trademarks at issue.

183.   Despite this, Highgate continues to use the Millennium Biltmore Hotel, the "M" logo, The Biltmore, and other trademarks relating to Millennium and/or the Biltmore Hotel in commerce in connection with the sale or advertising of goods or services by continuing to operate and hold itself out as the Biltmore Hotel despite the revocation of its license to do so under the HMA.

184.   The Registrant does not consent to Highgate's continued use of the Millennium Biltmore Hotel, the "M" logo, The Biltmore, and other trademarks relating to Millennium and/or the Biltmore Hotel following the termination of the trademark license contained in the HMA.

185.   Highgate's continued use of the Millennium Biltmore Hotel, the "M" logo, The Biltmore, and other trademarks relating to Millennium and/or the Biltmore Hotel is likely to cause confusion as to the affiliation, connection, or association of Highgate with Millennium, Registrant, Biltmore Owner, and the Biltmore Hotel; as guests of the Biltmore Hotel are likely to believe that it is being managed and operated by Millennium, Registrant, and Biltmore Owner rather than by Highgate given the use of the trademarks.

186.   The Registrant has been damaged and faces additional irreparable harm to the goodwill and reputation associated with its Millennium Biltmore Hotel, the "M" logo, The Biltmore, and other trademarks relating to Millennium and/or the Biltmore Hotel because of the poor performance by Highgate in managing and operating the Biltmore Hotel in breach of its obligations under the HMA.

187.   Highgate has willfully violated the Lanham Act because it continues to use the Millennium Biltmore Hotel, the "M" logo, The Biltmore, and other trademarks relating to

Millennium and/or the Biltmore Hotel despite its knowledge that any license to do so was immediately terminated upon the termination of the HMA.

188.    Because of Highgate's willful violation, the Registrant is suffering reputational damage and loss of goodwill associated with its trademarks.

189.    The Registrant is seeking injunctive relief through this matter to protect its trademarks.

WHEREFORE, the Registrant respectfully requests judgment in its favor and against Highgate on Count V of the Complaint, and entry of emergency injunctive relief of an order enjoining Highgate from using the Millennium Biltmore Hotel, the "M" logo, the Biltmore, and any other trademark relating to Millennium and/or the Biltmore Hotel, or holding itself out as being affiliated with the Biltmore Hotel; and requiring Highgate to immediately cease using the Millennium Biltmore Hotel, the "M" logo, the Biltmore, and any other trademark relating to Millennium and/or the Biltmore Hotel, or holding itself out as being affiliated with the Biltmore Hotel pursuant to Section 14.1.3 of the HMA, and immediately begin the orderly and expeditious transition of management functions of the Biltmore Hotel to Biltmore Owner pursuant to Section 22.1 of the HMA; as well as granting such other and further relief as this court deems just and appropriate.

## COUNT V

### TRESPASS

190.    Biltmore Owner incorporates by reference the allegations in Paragraphs 1 through 139 as if fully set forth herein.

191.    Biltmore Owner owns and controls the Biltmore Hotel.

192.    Following the termination of the HMA, Highgate had no authority or permission to remain in the Biltmore Hotel.

193.    On August 3, 2023, Biltmore Owner instructed Highgate that Highgate did not have permission to remain on the premises with access to all of Biltmore Owner's bank accounts, operational records, employee records, and other confidential information and data, nor did Highgate have permission to use the Millennium Biltmore Hotel trademark, the "M" logo trademark, The Biltmore, and any other trademarks relating to Millennium or the Biltmore Hotel. unless Highgate immediately agreed to abide by Section 22.1 of the HMA and begin transitioning operations of the Biltmore Hotel to Biltmore Owner.

194.    Nonetheless, Highgate has ignored Biltmore Owner's demands and remains on the premises without permission.

195.    Highgate's trespass has caused harm to Biltmore Owner. The harm caused to Biltmore Owner includes, but is not limited to, harm from not having the ability to control its own property, lost profits from being unable to operate its hotel, and being charged excess and unauthorized fees by Highgate.

WHEREFORE, Biltmore Owner respectfully requests judgment in its favor and against Highgate on Count V of the Complaint, as well as entry of emergency injunctive relief of an order enjoining Highgate from exercising possession, custody, or control over the Biltmore Hotel and any personal property, real property, intellectual property, bank accounts, or other tangible property belonging to Biltmore Owner; requiring Highgate to vacate the Biltmore Hotel; enjoining Highgate from using the Millennium Biltmore Hotel, the "M" logo, The Biltmore, or any other trademarks relating to Millennium or the Biltmore Hotel, or holding itself out as being affiliated with the Biltmore Hotel; enjoining Highgate from interfering with or exercising control

over employees of the Biltmore Hotel, including without limitation any act to interfere with notice to unionized employees at the Biltmore Hotel that Biltmore Owner is a successor employer; requiring Highgate to immediately begin the orderly and expeditious transition of management functions of the Biltmore Hotel to Biltmore Owner pursuant to Section 22.1 of the HMA; as well as granting such other and further relief as this court deems just and appropriate.

## COUNT VI

### CONVERSION

196.    Biltmore Owner incorporates by reference the allegations in Paragraphs 1 through 139 as if fully set forth herein.

197.    Prior to the HMA, Biltmore Owner had exclusive ownership, possession and control over the Biltmore Hotel, its personal property (i.e., furniture, appliances, etc.) its bank accounts, its financial data, and all operational property and data associated with the Biltmore Hotel (the "Property").

198.    Pursuant to the HMA, Highgate was given the ability to manage and operate Biltmore Owner's Property relating to the Biltmore Hotel.

199.    However, Biltmore Owner has terminated the HMA, which requires Highgate to immediately return all of Biltmore Owner's Property.

200.    Highgate has not returned the Property to Biltmore Owner.

201.    Highgate has no authority to maintain possession over the Property given the termination of the HMA.

WHEREFORE, Biltmore Owner respectfully requests judgment in its favor and against Highgate on Count VI of the Complaint, as well as entry of emergency injunctive relief of an order requiring Highgate to immediately return and surrender custody and control over the

Property; enjoining Highgate from exercising possession, custody, or control over the Biltmore Hotel and any personal property, real property, intellectual property, bank accounts, or other tangible property belonging to Biltmore Owner; enjoining Highgate from using the Millennium Biltmore Hotel, the "M" logo, The Biltmore, or any other trademarks relating to Millennium or the Biltmore Hotel, or holding itself out as being affiliated with the Biltmore Hotel; enjoining Highgate from interfering with or exercising control over employees of the Biltmore Hotel, including without limitation any act to interfere with notice to unionized employees at the Biltmore Hotel that Biltmore Owner is a successor employer; requiring Highgate to immediately begin the orderly and expeditious transition of management functions of the Biltmore Hotel to Biltmore Owner pursuant to Section 22.1 of the HMA; as well as granting such other and further relief as this court deems just and appropriate.

## COUNT VII

## SPECIFIC PERFORMANCE OF HMA SECTION 22.1

202.     Biltmore Owner incorporates by reference the allegations in Paragraphs 1 through 139 as if fully set forth herein.

203.     Biltmore Owner and Highgate were parties to a valid and enforceable contract, the HMA.

204.     Biltmore Owner has performed all of its obligations under the HMA.

205.     On August 3, 2023, Biltmore Owner terminated the HMA and/or terminated Highgate's agency over the Biltmore Hotel.

206.     Pursuant to Section 22.1 of the HMA, Highgate owes post-termination obligations to ensure the orderly and efficient transition of the Biltmore Hotel back to Biltmore Owner.

207.    Highgate has breached its post-termination obligations owed under Section 22.1 of the HMA by not performing any of its post-termination obligations.

208.    Biltmore Owner stands ready, willing, and able to perform the remainder of the post-termination obligations under the HMA.

209.    It is solely within Highgate's power to perform the post-termination obligations under Section 22.1 of the HMA, since it is currently in custody and control of the Biltmore Hotel and Biltmore Owner requires its cooperation to effectively transition management of the Biltmore Hotel back to Biltmore Owner.

210.    Highgate is not abiding by its obligations under the HMA, and no adequate remedy at law is available to Biltmore Owner. Every minute Highgate remains in custody and control of the Biltmore Hotel following the termination of the HMA harms Biltmore Owner's property rights to the Biltmore Hotel.

WHEREFORE, Biltmore Owner respectfully requests judgment in its favor and against Highgate on Count VII of the Complaint against Highgate by ordering Highgate to specifically perform its obligations under Section 22.1 of the HMA and begin the orderly and efficient transition of the operations of the Biltmore Hotel back to Biltmore Owner; as well as granting such other and further relief as this court deems just and appropriate.

Dated:  August 4, 2023                                   Respectfully submitted,


                                                         By:     /s/ *Cynthia Augello*

                                                         Cynthia Augello
                                                         Warren Law Group
                                                         519 8th Ave, 25th Fl.
                                                         New York, NY 10018
                                                         (212) 390-8229
                                                         cynthia@warren.law

                                                         Daniel A. Dorfman

David J. Ogles (*pro hac vice pending*)
Anna R. Boshardy (*pro hac vice pending*)
Matthew T. Connelly (*pro hac vice pending*)
Fox Swibel Levin & Carroll LLP
200 W. Madison Street, Ste. 3000
Chicago, IL 60606
ddorfman@foxswibel.com
dogles@foxswibel.com
aboshardy@foxswibel.com
mconnelly@foxswibel.com

ATTORNEYS FOR PLAINTIFF WHB
BILTMORE LLC and MILLENNIUM &
COPTHORNE INTERNATIONAL
LIMITED