**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WHB BILTMORE, LLC and MILLENNIUM & COPTHORNE INTERNATIONAL LIMITED, | ) ) ) ) ) Civil Action No.:1:23-cv-6849 |
| Plaintiffs, | ) ) |
| v. | ) ) |
| HIGHGATE HOTELS, L.P, | ) ) |
| Defendant. | ) ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**EMERGENCY MOTION FOR A**
**PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

Dated:  August 4, 2023

Respectfully submitted,

By:   /s/ *Cynthia Augello*
Cynthia Augello
Warren Law Group
519 8th Ave, 25th Fl.
New York, NY 10018
(212) 390-8229
cynthia@warren.law

Daniel A. Dorfman
David J. Ogles (*pro hac vice pending*)
Anna R. Boshardy (*pro hac vice pending*)
Matthew T. Connelly (*pro hac vice pending*)
Fox Swibel Levin & Carroll LLP
200 W. Madison Street, Ste. 3000
Chicago, IL 60606
ddorfman@foxswibel.com
dogles@foxswibel.com
aboshardy@foxswibel.com
mconnelly@foxswibel.com

ATTORNEYS FOR PLAINTIFF WHB BILTMORE LLC and MILLENNIUM & COPTHORNE INTERNATIONAL LIMITED

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ iii

I.     PRELIMINARY STATEMENT .....................................................................1

II.    FACTUAL BACKGROUND ..........................................................................3

    A.  Highgate Was Biltmore Owner's Agent in Managing the Biltmore Hotel........3

    B.  Highgate's Material Breaches, and Biltmore Owner's Notice of Default ........4

    C.  Highgate's Fraudulent Representations Prior to the Execution of the HMA ....5

    D.  Registrant's Trademarks ........................................................................6

    E.  The Termination Letter ..........................................................................7

III.   LEGAL STANDARDS ...................................................................................8

IV.   ARGUMENT ..................................................................................................9

    A.  Absent Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm ....................9

    B.  Plaintiffs are Likely To Succeed On the Merits And/Or Present A Sufficiently
       Serious Question In Light Of The Harm Suffered To Warrant Relief ............11

       1.  Biltmore Owner will likely prevail on its claim that Highgate's agency
           was revocable at will (Count I)................................................................12

       2.  Biltmore Owner will likely prevail on its declaratory judgment claim that
           the HMA was validly terminated for cause (Count II) ............................14

       3.  Biltmore Owner will likely prevail on its alternative claims for a
           declaratory judgment that the HMA is unenforceable against Biltmore
           Owner (Count III) and/or should be rescinded .........................................15

           i.      Biltmore Owner will show that its performance is excused or the
                  HMA is rescinded due to Highgate's material breach ..................15
           ii.     Biltmore Owner will likely succeed in showing fraudulent
                 inducement .................................................................................15

4.   Plaintiffs are likely to prevail on affirmative claims barring Highgate from exercising control over their property ........................................................ 20

    i.   Highgate will likely be found liable for trademark infringement because it lacks authority to use Registrant's trademarks after HMA was terminated .................................................................... 20

    ii.   Lacking authority to enter the Biltmore Hotel premises or control its personal property, Highgate will likely be found liable for trespass (Count V) and conversion (Count VI) ............................ 22

    iii.   Because the HMA and Highgate's agency were validly terminated, Biltmore Owner will likely prevail in its claims to specifically enforce Highgate's post-termination obligations ........................... 23

5.   At a minimum, there are serious questions going to the merits of Plaintiffs' claims ....................................................................... 24

C.   The Balance of Hardships Tips Heavily in Plaintiffs' Favor, And the Public Interest Would Not Be Disserved By The Issuance Of An Injunction Or TRO ........................................................................................................ 24

CONCLUSION ................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*7-Eleven, Inc. v. Khan*,
    977 F. Supp. 2d 214 (E.D.N.Y. 2013) ................................................................1, 9

*Am. Soc'y for Prevention of Cruelty to Animals v. J.C. Clothing Drive, Inc.*,
    19-CV-4401 (BMC), 2020 WL 93884 (E.D.N.Y. Jan. 7, 2020) ...........................20

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015).............................................................................8, 24

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*,
    794 F.2d 38 (2d Cir. 1986)..............................................................................22, 25

*Complex Sys., Inc. v. ABN AMRO Bank N.V.*,
    2014 WL 1883474 (S.D.N.Y. May 9, 2014) .........................................................10

*Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.*,
    429 F. Supp. 2d 582 (S.D.N.Y.)...........................................................................19

*Daily News Charities, Inc. v. USA Boxing, Metro. Ass'n*,
    2017 WL 11570691 (S.D.N.Y. Dec. 20, 2017) ......................................................8

*Eastern States Petroleum Co. v. Universal Oil Products Co.*,
    3 A.2d 768 (Del.Ch. 1939)....................................................................................8

*FHR TB, LLC v. TB Isle Resort, LP.*,
    865 F.Supp.2d 1172 (S.D.Fla., 2011) ...............................................................2, 13

*Flawless Style LLC v. Saadia Group LLC*,
    2023 WL 3687782 (S.D.N.Y. May 26, 2023) .........................................................4

*G.K. Alan Assoc., Inc. v. Lazzari*,
    840 N.Y.S.2d 378 (App.Div.2007) .......................................................................13

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*,
    2020 WL 915824 (S.D.N.Y. Feb. 26, 2020)...........................................................8

*Gulf Oil Ltd. P'ship v. Smerci*,
    2013 WL 394893 (E.D.N.Y. Jan. 30, 2013) ...........................................................9

*JLM Couture, Inc. v. Gutman*,
    2023 WL 2503432 (S.D.N.Y., 2023)....................................................................11

*JP Pizza Eastport LLC v Luigi's Main Street Pizza Inc.*,
  166 N.Y.S.3d 485 (N.Y. Sup. Ct. 2022) .........................................................15

*Just Tacos, Inc. v. Zezulak*,
  2011 WL 6140866 (D. Haw. Dec. 9, 2011)...................................................22

*Kaplan v. Cnty. of Orange*,
  528 F. Supp. 3d 141 (S.D.N.Y. 2021).............................................................22

*L & L Wings, Inc. v. Marco-Destin, Inc.*,
  676 F. Supp. 2d 179 (S.D.N.Y. 2009)..............................................................21

*Marks Org., Inc. v. Joles*,
  784 F. Supp. 2d 322 (S.D.N.Y. 2011)..............................................................25

*Mattel, Inc. v. AnimeFun Store*,
  18 CIV. 8824 (LAP), 2021 WL 765766 (S.D.N.Y. Feb. 26, 2021)......................20

*Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*,
  2018 WL 2012875 (E.D.N.Y. Apr. 30, 2018) ..................................................8

*Monterey Bay Military Housing, LLC v. Pinnacle Monterey LLC*,
  2015 WL 1548833 (N.D. Cal. 2015) ..............................................................13

*Moses v. Martin*,
  360 F. Supp. 2d 533 (S.D.N.Y. 2004).............................................................23

*MSHK Ltd. v. Tuto Pazzo, Inc.*,
  2009 WL 10700667 (S.D. Fla. June 16, 2009) ...............................................11

*Murjani Int'l, Ltd. v. Sun Apparel, Inc.*,
  87 CIV. 4628 (PKL), 1987 WL 15110 (S.D.N.Y. July 31, 1987).........................21

*Pacific Landmark Hotel , Ltd. v. Marriott Hotels, Inc.*,
  19 Cal. App. 4th 615 (1993) .........................................................................13

*Phage Diagnostics, Inc. v. Corvium, Inc.*,
  2020 WL 1816192 (Del. Super. Ct. Mar. 9, 2020) ..........................................19

*Remcoda, LLC v. Ridge Hill Trading (PTY) Ltd.*,
  2022 WL 603998 (S.D.N.Y. Mar. 1, 2022) .....................................................16

*Rogers Enterprises, Inc. v. Hitachi Sols. Am., Ltd.*,
  2022 WL 1410731 (C.D. Cal. Apr. 12, 2022) ..................................................18

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
  968 F.2d 371 (3d Cir. 1992)...........................................................................24

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) ............................................................................24, 25

*Scribner v. Summers*,
    84 F.3d 554 (2d Cir. 1996) ...................................................................................22

*Southland Corp. v. Froelich*,
    41 F. Supp. 2d 227 (E.D.N.Y. 1999) ................................................10, 15, 20, 21

*Taylor Precision Products, Inc. v. Larimer Group, Inc.*,
    2018 WL 4278286 (S.D.N.Y. Mar. 26, 2018) ......................................................18

*Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) .......................................................................................9

*TR Petroleum, LLC v. Sunoco, Inc. (R&M)*,
    2008 WL 897702 (E.D.N.Y. Mar. 31, 2008) .....................................................9, 11

*VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*,
    348 F. Supp. 2d 255 (S.D.N.Y. 2004) ..................................................................18

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
    901 A.2d 106 (Del. 2006) .......................................................................................8

**Statutes**

15 U.S.C. § 1114(1)(a) ...................................................................................................20

28 U.S.C. § 2201(a) .......................................................................................................12

Cal. Civ. Code § 2356 ................................................................................................2, 13

**Other Authorities**

Federal Rules of Civil Procedure Rule 65 ......................................................................8

Restatement (Third) Of Agency § 3.10 .........................................................................14

Plaintiffs WHB Biltmore, LLC ("**Biltmore Owner**" or "**Owner**") and Millennium & Copthorne International Limited (the "**Registrant**"), respectfully submit this Memorandum of Law in support of their emergency motion for a preliminary injunction and temporary restraining order:

## I.         PRELIMINARY STATEMENT

Defendant Highgate Hotels, L.P. ("**Highgate**") was terminated as the hotel manager for the Millennium Biltmore Hotel Los Angeles ("**Biltmore Hotel**") on August 3, 2023.  Upon sending the termination notice ("**Termination Notice**"), Biltmore Owner requested that Highgate promptly (i) relinquish control over Biltmore Owner's trademarks,[1] real estate, operations, and assets, and (ii) comply with the termination procedures outlined in the parties' Hotel Management Agreement ("**HMA**"), which requires Highgate to cooperate in transitioning management of the Biltmore Hotel back to Biltmore Owner. However, Highgate has not acknowledged its termination or the loss of authority to manage the Biltmore Hotel, thereby requiring Biltmore Owner to file its Complaint [Dkt. 1] along with this motion for emergency injunctive relief.

Courts routinely grant injunctive relief in situations such as this – where a business owner, franchisor, or trademark license holder revokes a service contract for management and/or use of their business and trademarks, but the agent, franchisee, or licensee refuses to relinquish control of the relevant real estate, business, or trademarks.  *See, e.g., 7-Eleven, Inc. v. Khan*, 977 F. Supp. 2d 214, 234 (E.D.N.Y. 2013).  Irreparable harm, arguably the most important factor in granting injunctive relief, is easily satisfied in these situations.  A suit for damages cannot compensate for the injury that could be caused by Highgate's unauthorized control of the Biltmore Hotel, which constitutes "irreparable harm" as a matter of law.

---

[1] As explained *infra*, the Biltmore Hotel trademarks are held by the Registrant.

Biltmore Owner will also easily establish a clear and substantial "likelihood of success on the merits" in this case.  In its Complaint, Biltmore Owner asserts claims for declaratory judgment that Highgate's management authority has been terminated pursuant to several theories, each of which is likely to succeed on the merits:

(1) Under New York law, a hotel owner can revoke the agency of a hotel manager *at will*. This power exists independently from any contractual bases for termination, and applies "even if [the revocation] breaches the applicable contract and even if [it] creates clear-cut liability for damages."  *FHR TB, LLC v. TB Isle Resort, LP*., 865 F.Supp.2d 1172, 1194–95 (S.D.Fla., 2011) (analyzing New York law); Cal. Civ. Code § 2356(a) (same).

(2) The HMA was validly terminated for cause, pursuant to its own terms, on multiple independent grounds.

(3) Biltmore Owner has additional, alternative claims for rescission and/or unenforceability of the HMA, which would extinguish Highgate's agency. These claims are also likely to prevail given the strong showing of material breach, fraudulent inducement, and unilateral mistake at this early stage.

Given that Highgate lacks the authority for its intended continued control of the Biltmore Hotel and its assets, Biltmore Owner's claims for trademark infringement, trespass, and conversion are also likely to succeed; so too its claims for breach of the post-termination provisions of the HMA.  Accordingly, this emergency motion for a temporary restraining order ("**TRO**") and preliminary injunction should be granted to prevent the irreparable harm that otherwise would result to Plaintiffs.

## II.     FACTUAL BACKGROUND

A. <u>Highgate Was Biltmore Owner's Agent in Managing the Biltmore Hotel</u>

The HMA established the terms and scope of Highgate and Biltmore Owner's agency relationship. Under the HMA, Highgate "agree[d] to supervise and direct the management, operation and all aspects of the Hotel as a full service hotel . . . in accordance with the terms and conditions" set out in the HMA. *See* HMA at § 2.1 (Ex. B to Ex. 1 (DeCarvalho Decl.)). *Id.* The HMA expressly states that Highgate is the "agent of Owner, [and] shall perform its duties hereunder on behalf of Owner, as principal." *Id.* at § 21.1. Nothing in the HMA purports to grant Highgate any continuing rights to Biltmore Owner's assets upon the revocation of the agency relationship. *See id.* at § 25.16 (limiting survival of HMA terms, specifying no terms related to continued operation or control). Indeed, Highgate's rights to Plaintiffs' intellectual property expire immediately upon termination. *Id.* at § 14.1.3.

Nothing in the HMA purports to contradict, vary, or limit Biltmore Owner's common law power to revoke Highgate's agency. Under Section 19.2, the HMA is terminable immediately upon an "Event of Default" – essentially, a termination for cause provision. *Id.* at § 19.2. An Event of Default occurs where a "material breach" has not been cured within thirty (30) days after notice to the breaching party. *Id.* at § 19.1.2. There are a number material provisions under the HMA which could give rise to an Event of Default, and subsequently termination for cause – including, but not limited to:

- Highgate was required to exercise "commercially reasonable, good faith efforts to operate the Hotel in such a manner so as to maximize the profitability of the Hotel over the long-term." *Id.* at § 2.1.

- Highgate was required to propose a transition Budget and Plan "promptly" after execution of the HMA, *see id.* at § 10.4.1, and was not permitted to spend any transition costs undisclosed in the plan, or exceed any line item expenditure by more than 5%. *Id.* at § 10.4.2.

- Highgate was required to propose an Annual Plan within 60 days of the Commencement Date (here, no later than February 1, 2023).  *Id.* at § 10.1.  In addition to a budget document, the Annual Plan must contain a sales and marketing plan, a staffing plan, and a capital expenditure plan.  *Id.*  The Annual Plan must be prepared to the satisfaction of Biltmore Owner, which has the right to reasonably approve or disapprove all or any part of the Annua Plan.  *Id.* at § 10.2.

- Highgate was required to "use reasonable efforts to operate the Hotel in accordance with the approved Annual Plan."  *Id.* at § 10.3.

- Highgate's expenditure authority was expressly limited to the approved Annual Plan.  Highgate was prohibited from incurring "costs or expenses or mak[ing] expenditures exceeding: (A) any departmental line item provided for in the Annual Plan by more than ten percent (10%); or (B) the aggregate amount of expenditures provided for in the Annual Plan by more than five percent (5%)."  *Id.*

- Highgate was permitted to incur certain centralized service charges under narrowly circumscribed conditions:  the charges must be "for services provided to the Hotel," not those merely made available.  *Id.* at § 5.1.  Second, no "profit or mark-up" may inure to Highgate from these charges.  Third, Biltmore Owner was permitted to withdraw or opt-out of the services.  *Id.*

B. <u>Highgate's Material Breaches, and Biltmore Owner's Notice of Default</u>

By letter delivered on or before July 3, 2023, Biltmore Owner provided a notice of default (the "**Default Notice**") identifying numerous material breaches (including details showing that each of the above provisions were breached) and unpaid sums requiring reimbursement.  *See* Exs. A & B to Ex. 2 (Ogles Decl.).[2]

Highgate's management was a disaster. *See generally* Ex. 1 (DeCarvalho Decl.).  Highgate failed to present a Transition Plan.  *Id.* at ¶ 58.  Highgate failed to timely submit the Annual Plan.  *Id.* at ¶ 56.  When the Annual Plan was submitted, it was woefully incomplete, lacking any sales and marketing plan, or capital expenditure plan.  *Id.*

---

[2] The Default Notice also exercised Biltmore Owner's right to terminate the HMA for convenience no later than February 2025, without prejudice to any other rights or remedies.

Lacking any sales, marketing, or capital expenditure plan, Highgate's plan for the actual operation of the Biltmore Hotel was commercially unacceptable.  *Id.* at ¶ 57.  Highgate failed to timely fill key positions such as sales director, general manager, and HR director.  *Id.* at ¶¶ 23-30.  Sales staff positions were and remain underfilled.  *Id.* at ¶¶ 23-30.  Despite staffing shortages, payroll and overhead charges to the hotel grew well above any increase in revenue.  *Id.* at ¶ 37.  Historical profit centers, such as food and beverage revenues, now operated at virtually break-even levels. *Id.* at ¶ 46.  Rather than maximize the profitability of the Biltmore Hotel, Highgate directed sales efforts to obtaining low-margin revenue, acts consistent with preserving Highgate's own base management fees (which were tied to revenue levels).  *See* HMA at § 4.1 (Ex. B to Ex. 1 (DeCarvalho Decl.)).  This was to the detriment of Biltmore Owner's gross operating profits and EBITDA.  *See* Ex. 1 (DeCarvalho Decl.) at ¶¶ 15-22.

In addition, Highgate repeatedly incurred unauthorized expenses without Biltmore Owner's prior approval, as required under the HMA.  *See* Ex. 1 (DeCarvalho Decl.) at ¶¶ 36-44.  The Default Notice detailed numerous line items with expenditures that far exceeded spending limits, and showed that aggregate expenditures also exceeded the limits.  *See* Ex. A to Ex. 2 (Ogles Decl.).  Highgate also charged for IT services that it **never** provided to the Biltmore Hotel, which remained on Biltmore Owner's systems.  *See* Ex. 1 (DeCarvalho Decl.) at ¶¶ 60-65.

C.  Highgate's Fraudulent Representations Prior to the Execution of the HMA

It has become clear to Biltmore Owner that Highgate's management of the Biltmore Hotel was doomed from the outset, as Highgate employed fraudulent bait-and-switch tactics in order to induce Biltmore Owner into executing the HMA.

Prior to contracting with Highgate, Biltmore Owner profitably managed the Biltmore Hotel on its own.  *See* Ex. 1 (DeCarvalho Decl.) at ¶¶ 20-22.  In 2022, Highgate pitched its hotel

management services to Biltmore Owner, and in doing so, presented detailed pro forma financial statements, representing that Highgate's plans and resources would unlock significant increases in earnings for the Biltmore Hotel.  *See* Ex. 3 (Yam Decl.) at ¶¶ 7, 13-14; *see also* Ex. C to Ex. 3. The pro forma financial statements forecasted eight-figure increases in bottom line net profit over the course of the next five years, and Highgate assured Biltmore Owner that Highgate would "easily" achieve double-digit percentage increases to net profit in the first year alone.  *Id.* at ¶¶ 7, 13-14; *see also* Ex. C to Ex. 3.  Highgate represented that the figures in its pro forma financial statements were premised upon "revenue management and distribution," and controlling expenses "through a strategical implementation of a synergized staffing model" while leveraging "Highgate's scale."  *See* Ex. 3 (Yam Decl.) at ¶ 7, *see also* Ex. C to Ex. 3.  Biltmore Owner's officers believed this meant Highgate had a plan in place at that time for achieving these results. *See* Ex. 3 (Yam Decl.) at ¶ 15.  As described herein, those plans did not exist.

Less than four months after the execution of the HMA, Highgate presented a new budget that departed significantly from the pre-contractual representations Biltmore Owner relied upon in executing the HMA. *See* Ex. 1 (DeCarvalho Decl.) at ¶¶ 31-35.  The new budget virtually eliminated the promised profit increase.  *Id.*  Even though Highgate had acted as an asset manager for the Biltmore Hotel for two months before execution the HMA, it never raised that there was anything wrong with its initial projections *before* the HMA was executed despite having the opportunity to do so.  *See* Ex. 3 (Yam Decl.) at ¶¶ 19-22.

### D.  Registrant's Trademarks

The Registrant owns the trademarks "Millennium Biltmore Hotel" (Registration Number 5189857) and the "M" logo (Registration Number 5484698) which are registered with the United States Patent and Trademark Office ("USPTO"), as well as "The Biltmore" (serial number

97769018) which has been submitted to the USPTO. *See* Exhibit 4. The Registrant also owns other trademarks with the United States Patent and Trademark Office relating to Millennium and/or the Biltmore Hotel, including logo, word, and design marks.

E. <u>The Termination Letter</u>

Highgate's terrible business practices have destroyed the profitability of the Biltmore Hotel against any reasonable yardstick. Compared to 2022, the year before the HMA was executed, the Biltmore Hotel has lost *millions* in gross operating profit and EBITDA (*see* Ex. 1 (DeCarvalho Decl.) at ¶¶ 15-19) – though Highgate represented to Biltmore Owner that they would "easily" *increase* profit by millions. Ex. 3 (Yam Decl.) at ¶ 14.

To date, Highgate has made no efforts to cure any of the material breaches within the 30-day cure period since the Default Notice was delivered. *See generally* Ex. 1 (DeCarvalho Decl.). Additionally, Biltmore Owner has discovered that Highgate has also breached Section 12.5 of the HMA, which provides that "Richard Russo and Steve Batta shall be active in providing Operator oversight of the Hotel." HMA at § 12.5 (Ex. B to Ex. 1 (DeCarvalho Decl.)). Mr. Russo has **never** visited the Biltmore Hotel and has not made any material contributions to its oversight. *See* Ex. 1 (DeCarvalho Decl.) at ¶¶ 51-54.

On August 3, 2023, the day after the cure period expired, Biltmore Owner transmitted a Notice of Termination and Revocation ("**Termination Letter**") to Highgate. *See* Ex. C to Ex. 2 (Ogles Decl.). The letter informed Highgate that the HMA was terminated for cause due to Events of Default specified in the Default Notice. *Id.* Further, the Termination Letter stated:

> Also through this letter, and notwithstanding anything in the HMA to the contrary, Biltmore Owner exercises its statutory and/or common law rights to immediately and fully revoke the agency relationship that existed between Biltmore Owner and Highgate. To avoid all doubt, Highgate has no authority to act as agent for Biltmore Owner, nor to exercise control over or use any property of Biltmore Owner. *Id.*

### III.   <u>LEGAL STANDARDS</u>

Rule 65 of the Federal Rules of Civil Procedure authorizes the issuance of preliminary injunctions and TROs. In the Second Circuit, the standard for entry of a TRO is the same as for a preliminary injunction. *Daily News Charities, Inc. v. USA Boxing, Metro. Ass'n*, 2017 WL 11570691, at *1 (S.D.N.Y. Dec. 20, 2017).  To obtain a preliminary injunction or TRO, the moving party must demonstrate: (1) "a likelihood of irreparable injury in the absence of an injunction"; (2) "a likelihood of success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (3) "that the balance of hardships tips in the plaintiff's favor"; and (4) "that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks omitted).  Of these, irreparable harm "is the single most important." *Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*, 2018 WL 2012875, at *5 (E.D.N.Y. Apr. 30, 2018).

Additionally, an *ex parte* temporary restraining order may be granted where, as here, immediate and irreparable injury will result to the movant before the adverse party can be heard in opposition. Fed. R. Civ. P. 65(b)(1).[3]

For the purposes of granting a preliminary injunction, the "status quo" refers to the "last actual, peaceable uncontested status which preceded the pending controversy." *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, 2020 WL 915824, at *8 (S.D.N.Y. Feb. 26, 2020).  "In other words, the 'status quo' in preliminary-injunction parlance is really a 'status quo ante,'" shutting out "defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing." *Id.* (internal quotation marks omitted).

---

[3] The requisite attorney certification regarding notice to opposing party is attached as Exhibit 2.

Here, as explained below, Plaintiffs satisfy all requirements for immediate issuance of a TRO and preliminary injunction, which is necessary to restore the parties to the status quo that existed before Highgate's malfeasance.

## IV.   **ARGUMENT**

### A.   Absent Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm.

The Biltmore Owner and the Registrant face irreparable harm if the TRO and preliminary injunction are not granted. Irreparable harm is "an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995). "The alleged injury must be actual and imminent, not remote or speculative." *7-Eleven, Inc.*, 977 F. Supp. 2d at 234.

Courts have long recognized that "unauthorized interference" with real property "constitutes irreparable harm as a matter of law." *TR Petroleum, LLC v. Sunoco, Inc. (R&M)*, 2008 WL 897702, at *2 (E.D.N.Y. Mar. 31, 2008) (holding irreparable harm established where defendant continued to occupy Sunoco gas station despite plaintiff terminating franchise agreement); *see also 7-Eleven, Inc.*, 977 F. Supp. 2d at 234 (holding plaintiff established irreparable harm where defendant continued to occupy plaintiff's store despite plaintiff terminating defendant's franchise rights). When a party refuses to handover real property following the termination of a franchise or management agreement, irreparable harm flows from the property owner's inability to make use of, improve, or otherwise control the owner's property. *See Gulf Oil Ltd. P'ship v. Smerci*, 2013 WL 394893, at *5 (E.D.N.Y. Jan. 30, 2013) ("Defendants' continued occupation of plaintiff's property and use of its equipment deprives plaintiff of the ability to make productive use of the subject premises, which constitutes irreparable harm."); *see also TR Petroleum, LLC*, 2008 WL 897702, at *2; *7-Eleven, Inc.*, 977 F. Supp. 2d at 234.

Here, pursuant to the HMA, Highgate has access to Biltmore Owner's real property (*i.e.*, the Biltmore Hotel), as well as Biltmore Owner's confidential financial information, bank accounts, employee information, contracts with vendors, business assets, and all other operational data and information.  *See* Ex. 1 (DeCarvalho Decl.) at ¶ 10.  But even though Biltmore Owner has terminated the HMA, *see* Ex. C to Ex. 2 (Ogles Decl.), Highgate continues to maintain possession of the Biltmore Hotel and have access to the above information.  *See* Ex. 1 (DeCarvalho Decl.) at ¶ 11.  Biltmore Owner's inability to control and make use of its own real property (the Biltmore Hotel) and other assets is, by itself, irreparable harm as a matter of law that warrants the issuance of a TRO and injunction.  Further, the facts here are even stronger for establishing irreparable harm because to deny the TRO will result in Highgate – a revoked agent – controlling Biltmore Owner's real property and accessing its confidential financial information, bank accounts, employee information, contracts with vendors, business assets, and all other operational data and information against Biltmore Owner's will.  *See* Ex. 1 (DeCarvalho Decl.) at ¶¶ 10-11.

In addition, Highgate's unauthorized access to Registrant's trademarks constitutes irreparable harm as a matter of law.  "The unauthorized use of a [trade]mark by a former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark." *Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 242 (E.D.N.Y. 1999); *see also Complex Sys., Inc. v. ABN AMRO Bank N.V.*, 2014 WL 1883474, at *13 (S.D.N.Y. May 9, 2014) (citing multiple cases holding that "reputational harm" and harm to "goodwill" through a defendant misusing plaintiff's trademarks constitutes irreparable harm).  "There is a compelling need for injunctive relief ... when [a] case involves a former licensee because, after a license is revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder."  *TR Petroleum, LLC*, 2008 WL

897702, at *2.  "A former licensee who no longer has a valid trademark license but who continues to identify his business as associated with the licensor causes irreparable harm to the licensor because of licensor's loss of control in the use their marks and the resulting loss of reputation and goodwill." *MSHK Ltd. v. Tuto Pazzo, Inc.*, 2009 WL 10700667, at *4 (S.D. Fla. June 16, 2009). Relatedly, even a former agent's continued control of a principal's website constitutes irreparable harm. *See JLM Couture, Inc. v. Gutman,* 2023 WL 2503432, at *16 (S.D.N.Y., 2023).

Here, Highgate has had its license to use Registrant's trademarks revoked through the termination of the HMA.  *See* Ex. C to Ex. 2 (Ogles Decl.); *see also* HMA at §§ 14.1.2; 14.1.3 (Ex. B to Ex. 1 (DeCarvalho Decl.)).  Yet, Highgate has not ceased operating the Biltmore Hotel, and continues to operate using Registrant's trademarks.  *See* Ex. 3 (DeCarvalho Decl.) at ¶¶ 10-11.  Therefore, as the cases above make clear, Registrant faces irreparable harm as a matter of law from Highgate's unauthorized use of the trademarks following the termination of its license.

Further, the Court must also take into account Highgate's demonstrated incompetence, dishonesty, and fraudulent behavior throughout the parties' history, which makes the risk of irreparable harm even higher.  Highgate has already devastated the Biltmore Hotel's profitability. *See* Ex. 1 (DeCarvalho Decl.) at ¶¶ 15-22.  Each week Highgate continues to control the Biltmore Hotel, it damages the reputation and the goodwill of the Biltmore Hotel.

B. <u>Plaintiffs are Likely To Succeed On The Merits And/Or Present A Sufficiently Serious Question In Light Of The Harm Suffered To Warrant Relief.</u>

Under Section 23.3.7 of the HMA, the parties agreed that any action for "injunctive or emergency relief" is not subject to the HMA's arbitration clause.[4]  HMA at § 23.3.7 (Ex. B to Ex. 1 (DeCarvalho Decl.)).  The Complaint advances seven counts limited to advancing only this relief.

---

[4] Biltmore Owner will be pursuing damages through an arbitration proceeding.

This section is organized into five Parts.  In Parts B.1-B.3, Plaintiffs analyze the three declaratory judgment claims (Counts I-III),[5] each of which assert independent bases to conclude that Highgate has no present or future authority to act as Biltmore Owner's agent, or to control or possess Biltmore Owner's assets.  This section will show that Biltmore Owner is likely to prevail on each of these theories, though just one is sufficient to warrant relief.  In Part B.4, Plaintiffs discuss the affirmative claims for injunctive relief (trademark infringement, trespass, conversion, and specific performance of the HMA) that will plainly prevail in light of Highgate's lack of ongoing authority.  Finally, Part B.5 explains that Plaintiffs also prevail under the lower "serious question" standard, given the gravity of the harm they will suffer compared to Highgate's minimal interest, which can be vindicated through claims for damages.  Plaintiffs have plainly satisfied this element for a TRO and preliminary injunction.

1. **Biltmore Owner will likely prevail on its claim that Highgate's agency was revocable at will (Count I).**

Count I of the Biltmore Owner's Complaint seeks a declaratory judgment that Highgate's agency relationship has been revoked, pursuant to Biltmore Owner's absolute right of revocation as principal, regardless of any contract provision to the contrary.

In New York, "the general rule is that the principal has the power to revoke the agency even if that revocation is wrong, even if it breaches the applicable contract and even if the revocation creates clear-cut liability for damages."  *FHR TB, LLC*, 865 F.Supp.2d at 1194–95 (analyzing New York law).  New York courts "sharply distinguish between the parties' powers, rights and duties arising under the contract itself, and those arising under the agency relationship created by the contract."  *Id.*  Here, it is "well settled that, with but a few exceptions ... a principal

---

[5] The Declaratory Judgment Act provides that a federal court "may declare the rights and other legal relations of any interested party seeking such declaration . . . Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

has the power to revoke at any time his agent's authority to represent him." *Id.*; *see also G.K. Alan Assoc., Inc*. v. *Lazzari*, 840 N.Y.S.2d 378 (N.Y. App. Div. 2d Dept. 2007), *aff'd*, 893 N.E.2d 133 (N.Y. 2008) ("a principal is always free to terminate the agency relationship, subject to a claim for damages by the agent...."). This rule has been specifically extended to "the hotel management contract context, [where] courts have enforced this basic law and classified agency relationships as revocable **even where the HMA or similar contract expressly provided to the contrary**." *FHR TB, LLC*, 865 F.Supp.2d at 1195 (emphasis in original).

Likewise in California, where Biltmore Hotel is located, California Civil Code § 2356 codified the "cardinal rule of agency law" that "a principal who employs an agent always retains the power to revoke the agency." *Monterey Bay Military Housing, LLC v. Pinnacle Monterey LLC*, 14-CV-03953-BLF, 2015 WL 1548833, at *7 (N.D. Cal. 2015) (quoting *Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc.*, 19 Cal. App. 4th 615 (1993)). The statute provides: "[u]nless the power of an agent is coupled with an interest in the subject of the agency, it is terminated by . . . [i]ts revocation by the principal." Cal. Civ. Code § 2356. This language codifies a "statutory power" that is "independent and distinguishable from a contractual right to revoke an agency." *Pacific Landmark Hotel, Ltd*, 19 Cal. App. 4th at 624–25. "Thus, even if there is no contractual right to revoke an agency, section 2356, subdivision (a)(1) gives the principal the statutory power to do so." *Monterey Bay Military Housing, LLC*, 2015 WL 1548833, at *7.

Here, Biltmore Owner had the absolute right to revoke Highgate's agency, regardless of the content of the HMA. *See, e.g.*, Restatement (Third) Of Agency § 3.10 ("Notwithstanding any agreement between principal and agent, an agent's actual authority terminates if the agent renounces it by a manifestation to the principal or if the principal revokes the agent's actual authority by a manifestation to the agent. A revocation or a renunciation is effective when the other

party has notice of it.").  Biltmore Owner did clearly and unmistakably revoke Highgate's agency, via notice sent and received prior to this filing.  *See* Ex. C to Ex. 2 (Ogles Decl.).  Accordingly, Biltmore Owner is likely, if not certain, to prevail on the merits.

        **2.**    **Biltmore Owner will likely prevail on its declaratory judgment claim that the HMA was validly terminated for cause (Count II).**

Count II seeks a declaratory judgment that Biltmore Owner properly terminated the HMA for cause, pursuant to its terms.  The HMA can be terminated immediately upon Event of Default. *See* HMA at § 19.2 (Ex. B to Ex. 1 (DeCarvalho Decl.)).  An Event of Default exists where there is either a material breach, and the breach is not cured after thirty (30) days' notice (*id.* at § 19.1.2), or a past due payment remains unpaid for 10 days after notice (*id.* at § 19.1.1).  Here, the Default Notice was delivered to Highgate no later than July 3, 2023, identifying numerous grounds for termination. *See* Ex. 2 (Ogles Decl.) at ¶¶ 2-3; *see also* Exs. A & B to Ex. 2.  Yet, Highgate did not even attempt to cure the breaches in question. On August 3, 2023, after the cure period expired, Biltmore Owner delivered the Termination Letter, which advised the HMA was terminated immediately due to the existence of multiple Events of Default.  Ex. C to Ex. 2.

Biltmore Owner has presented a compelling case that one or more Events of Default occurred under the HMA, any one of which would justify termination for cause.  *See supra*, Sections II.B-C.  Accordingly, Biltmore Owner is likely to prevail on its claim for declaratory judgment that the HMA was validly terminated for cause.

        **3.**    **Biltmore Owner will likely prevail on its alternative claims for a declaratory judgment that the HMA is unenforceable against Biltmore Owner (Count III) and/or should be rescinded (Count IV).**

Even if Highgate could overcome well-established law that its agency was revocable at Biltmore Owner's will, or Biltmore Owner's strong grounds for valid termination for cause, Count III of Plaintiffs' Complaint presents alternative grounds to declare the HMA unenforceable or

rescinded on the bases of: material breach, fraudulent inducement, and unilateral mistake. These alternative theories also preclude Highgate from continuing to control the Biltmore Owner's assets.

> i. *Biltmore Owner will show that its performance is excused or the HMA is rescinded due to Highgate's material breach.*

In New York, "a party is relieved of its duty to perform under a contract when the other party has committed a material breach." *JP Pizza Eastport LLC v Luigi's Main Street Pizza Inc.*, 166 N.Y.S.3d 485, 490 (N.Y. Sup. Ct. 2022). Further, "a material breach that goes to the root of the matter or the essence of the contract constitutes grounds for rescission without opportunity to cure." *Southland Corp.*, 41 F. Supp. 2d at 246.

As discussed in Sections II.B and C, *supra*, Biltmore Owner has set out a compelling case that Highgate materially breached the HMA. These breaches go to the "root of the agreement between the parties." *JP Pizza*, 166 N.Y.S.3d at 490. Highgate has deprived Biltmore Owner of the benefit of its bargain through these breaches, and as such Biltmore Owner's performance (including any continued authority to operate the Biltmore Hotel) is excused, and/or the HMA is otherwise rescinded.

> ii. *Biltmore Owner will likely succeed in showing fraudulent inducement.*

"To state a claim for fraudulent inducement under New York law, a claimant must allege that (1) the defendant made a representation as to a material fact; (2) such representation was false; (3) the defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss." *Remcoda, LLC v. Ridge Hill Trading (PTY) Ltd.*, 2022 WL 603998, at *10 (S.D.N.Y. Mar. 1, 2022) (cleaned up). A plaintiff can "plead fraudulent intent through facts that either (1) show that the defendant had both the motive and opportunity to

commit the alleged fraud, or (2) constitute strong circumstantial evidence of conscious misbehavior **or recklessness**." *Id.* at 12 (emphasis added).

Biltmore Owner will be able to show each of these elements. **First**, Highgate made representations to Biltmore Owner as to material facts, including in the form of the June 10, 2022 pro forma financial projections that Highgate provided to Biltmore Owner. *See* Ex. 3 (Yam Decl.) at ¶ 7, *see also* Ex. C to Ex. 3. Highgate asserted that their numbers were based on a tour of the Biltmore Hotel, and subjected to "underwriting" after "reviewing the numbers." *Id.* Highgate's estimates forecasted the impact of Highgate's plans to improve "revenue management and distribution," and control expenses "through a strategical implementation of a synergized staffing model" while leveraging "Highgate's scale." *Id.* These statements promised an expected immediate and positive impact to Biltmore Owner's bottom line profit of more than **44%**.[6] Highgate's estimates were bolstered by oral assurances, such as when Highgate representatives stated that Highgate could "**easily**" improve performance by at least ten percent (10%) on October 6, 2022. *See* Ex. 3 (Yam Decl.) at ¶¶ 13-14.

**Second**, Biltmore Owner will be able to show Highgate's representations were false. In April 2023, less than four months after the HMA was signed, Highgate submitted forecasted profits that were far worse than those represented in the *pro forma* statements. Ex. 1 (DeCarvalho Decl.) at ¶¶ 31-35. Performance at these levels was never discussed as a possibility during the negotiation of the HMA (*see generally* Ex. 3 (Yam Decl.)), and fell far beneath the 10% improvement Highgate communicated that it would "easily" achieve. *Id.* at ¶¶ 13-14. The new budget reflected

---

[6] The statements specifically showed that the expected impact of Highgate's plans, staffing, and management was an increase from $11,472,000 in gross operating profit forecasted through 2022, to $14,621,000 through year end 2023, with further increases of $19,021,000 by 2024, and $21,471,000 by 2025. The statements also specifically represented an increase in bottom-line EBITDA from $7,141,000 in 2022 to $10,353,000 in 2023 (and then to $13,836,000 in 2024 and $15,824,000).

Highgate's abysmal performance: rather than improve bottom line profit, Highgate's management has caused the Biltmore Hotel to operate at a significant *loss*.  Ex. 1 (DeCarvalho Decl.) at ¶ 19. It became clear that Highgate's representations regarding their ability to "easily" achieve significant increased profits within a year were patently false.

**Third**, Highgate must have known that it didn't have the plans or staff promised to Biltmore Owner – or, at absolute minimum, it must have been recklessly indifferent to the truth of the detailed financial estimates it provided to Highgate. *See* Ex. 1 (DeCarvalho Decl.) at ¶¶ 56 (Highgate failed to ever submit marketing, sales, or capital expenditures plans); 23-30 (Highgate failed to timely fill key staff roles at the Biltmore Hotel); 43-47 (high-margin revenue streams like food and beverage converted into unprofitable sales under Highgate's direction).  Furthermore, Highgate acted as interim asset manager for the Biltmore Hotel for *two months* before the HMA was executed (*id.* at ¶¶ 4-6) – affording Highgate ample opportunity to correct its projections if it discovered anything was not as expected at the Biltmore Hotel.  *See* Ex. 3 (Yam Decl.) at ¶ 21. Instead, during this time, Highgate pushed to close the deal without any corrections to its statements. *Id.* at ¶ 22; *see also* Ex. 1 (DeCarvalho Decl.) at ¶¶ 4-6.

**Fourth**, Biltmore Owner, who had previously successfully managed the Biltmore Hotel on its own, would never have entered into the HMA if not for these projections.  Highgate presented these statements with the intent to induce Biltmore Owner to enter the HMA.  *See* Ex. 3 (Yam Decl.) at ¶ 7.  Biltmore Owner has testimony and documents showing that it actually and reasonably relied upon these misrepresentations, that the officials working on the negotiations would not have recommended the HMA were it not for Highgate's statements, and that Highgate knowingly induced this trust.  *Id.* at ¶¶ 7, 13-18.  Given that Highgate was already a trusted agent

at the time the HMA was executed (*id.* at ¶¶ 9-11, 19), Biltmore Owner's reliance on Highgate's statements was all the more reasonable.

**Fifth**, Biltmore Owner has suffered significant and easily demonstrable injury as a result of Highgate's deception.  Ample case law supports the conclusion that Highgate's bait-and-switch constitutes actionable fraud.  The misrepresentations to Biltmore Owner were (i) "not reasonably supported by the available evidence," *Taylor Precision Products, Inc. v. Larimer Group, Inc.*, 1:15-CV-4428 (ALC), 2018 WL 4278286, at *24 (S.D.N.Y. Mar. 26, 2018), or (ii) constituted "half-truth[s]" that were "materially misleading."  *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 272 (S.D.N.Y. 2004).

Here, Highgate's pro forma financial statements and other statements made leading up to the HMA were not mere puffery; they were detailed projections, with specific numbers and timelines, allegedly based on Highgate's expertise and review of Biltmore Owner's materials.  *See* Ex. 3 (Yam Decl.) at ¶¶ 4-13.  Courts have found that such statements can form the basis for a fraudulent inducement claim. *See Rogers Enterprises, Inc. v. Hitachi Sols. Am., Ltd.*, 2022 WL 1410731, at *8 (C.D. Cal. Apr. 12, 2022) (representations regarding defendant's ability to achieve specific results within a certain timeline and budget could form actionable basis for fraudulent inducement); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006) (holding that statement couched as an "estimate" was actionable because it "suggest[ed] the reasonable belief that it was based on facts known to the maker"); *Eastern States Petroleum Co. v. Universal Oil Products Co.*, 3 A.2d 768, 777 (Del.Ch. 1939) (explaining that the characterization of information as an estimate is not controlling as to whether it is a representation of present fact or opinion as to future events); *Phage Diagnostics, Inc. v. Corvium, Inc.*, 2020 WL 1816192, at *7

(Del. Super. Ct. Mar. 9, 2020) (explaining statements, including regarding estimated timelines, can constitute affirmative statements for purposes of fraud analysis).

> ### *iii. Biltmore Owner is also likely to succeed on the defense of unilateral mistake.*

Under New York law, a court may allow the rescission of a contract on the basis of unilateral mistake where a party establishes that "(i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made." *Creative Waste Mgmt., Inc. v. Capitol Env't Servs., Inc.*, 429 F. Supp. 2d 582, 599 (S.D.N.Y.). Where "the party establishes a unilateral mistake as to a basic assumption of the contract, a court may void releases even in the absence of fraud." *Id.* (internal quotation marks omitted).

Here, even if there was no fraudulent intent on the part of Highgate, the representations identified in Section I.B.3.ii, *supra* give rise to the defense of mistake. As stated above, Highgate's representations were factual. Fundamental to Biltmore Owner's agreement to enter into the HMA was its expectation that Highgate was certain to increase the profitability of the Biltmore Hotel, and that Highgate had the plans, staffing, and expertise to achieve the expected improvement. *See* Ex. 3 (Yam Decl.) at ¶¶ 15-18. This understanding was fundamentally incorrect, through no fault of Biltmore Owner. Biltmore Owner's belief that the represented financial impact of Highgate management was actually achievable, or that Highgate could prepare an adequate plan and assemble sufficient staff to achieve these outcomes, were accordingly mistakes of material fact. And Highgate knew, or reasonably should have known, that such mistakes were being made by Biltmore Owner given its representations. *Id.* at ¶¶ 7, 13-14. Thus, for this additional reason, Biltmore Owner is likely to prevail in its claims that the HMA is void and should be rescinded.

19

**4. Plaintiffs are likely to prevail on affirmative claims barring Highgate from exercising control over their property**

    i.  *Highgate will likely be found liable for trademark infringement because it lacks authority to use Registrant's trademarks after the HMA was terminated.*

Count IV of the Complaint asserts claims against Highgate under the Lanham Act for unauthorized use of trademarks. The Lanham Act imposes liability on any person who, without the consent of the trademark registrant, uses a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" in connection with commercial activity, where "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).   To prevail on a trademark infringement claim, a plaintiff must show that "(1) the plaintiff registered its mark, (2) the defendant, without the plaintiff's consent, (3) 'used in commerce' (4) a reproduction of the plaintiff's mark 'as part of the' sale, distribution, or advertisement of a good, (5) where such use was likely to cause confusion." *Am. Soc'y for Prevention of Cruelty to Animals v. J.C. Clothing Drive, Inc.*, 19-CV-4401 (BMC), 2020 WL 93884, at *2 (E.D.N.Y. Jan. 7, 2020).   To establish a likelihood of success on the merits under the Lanham Act, all that needs to be shown is "a likelihood of confusion." *Southland Corp.*, 41 F. Supp. 2d at 243.

The standard is clearly met here. In regard to the first element, a certificate of trademark registration is prima facie evidence of the validity of a mark.  *Mattel, Inc. v. AnimeFun Store*, 18 CIV. 8824 (LAP), 2021 WL 765766, at *5 (S.D.N.Y. Feb. 26, 2021).  Here, the Registrant owns the registered trademarks "Millennium Biltmore Hotel" and the "M" logo – among other trademarks relating to Millennium and the Biltmore Hotel – which are registered with the United States Patent and Trademark Office. *See* Exhibit 4.  There is no dispute that the Registrant has a valid mark that is entitled to protection under the Lanham Act.

Further, there is no dispute that Highgate is currently using the mark, in commerce, in connection with the sale or advertising of goods or services; as that is exactly what the HMA licenses Highgate to do. *See* HMA at § 14.1.2 (Ex. B to Ex. 1 (DeCarvalho Decl.)).  Moreover, there is no dispute that Highgate is using this trademark without Biltmore Owner's consent because Biltmore Owner has terminated the HMA, plainly extinguishing Highgate's authority to use to the trademark under the terms of the HMA. *See id.* at § 14.1.3

Finally, there is no dispute that a likelihood of confusion arises from Highgate's use of the trademark "Millennium Biltmore Hotel," the "M" logo, "The Biltmore," and any other trademark relating to Millennium or the Biltmore Hotel.  The "likelihood of confusion" is conclusively established where, as here, an "alleged unauthorized user of the trademark continues to use the identical, previously licensed trademark, after revocation of the license." *Southland Corp*, 41 F. Supp. 2d at 243.  Highgate's license to use the trademarks was revoked with the termination of the HMA, but Highgate has not acknowledged the revocation and continues to operate using the trademarks. As a matter of law, there is a likelihood confusion under these facts. *See L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009) ("When an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law."); *Murjani Int'l, Ltd. v. Sun Apparel, Inc.*, 87 CIV. 4628 (PKL), 1987 WL 15110, at *10 (S.D.N.Y. July 31, 1987) ("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated [licensee] continues to use the former [licensor's] trademarks.") (quoting *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983)).  Indeed, it has been widely recognized that "a licensor's case for a preliminary injunction against a holdover dealer or franchisee is stronger than in the ordinary trademark infringement case," both in the analysis of "irreparable harm" and "likelihood of success on the merits" factors.  *Just Tacos, Inc. v. Zezulak*,

2011 WL 6140866, at *7 (D. Haw. Dec. 9, 2011) (discussing likelihood of success on the merits) (citing 4 McCarthy on Trademarks and Unfair Competition § 25:31 (4th ed.2011)); *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42 (2d Cir. 1986). Accordingly, there is a clear and substantial likelihood that the Registrant will prevail on the merits under its Lanham Act claim.

    ii.  *Lacking authority to enter the Biltmore Hotel premises or control its personal property, Highgate will likely be found liable for trespass (Count V) and conversion (Count VI).*

Biltmore Owner's final two counts are a count for trespass (Count V) and conversion (Count VI). Both claims ultimately rely on the same set of facts: because the HMA is terminated, Highgate has no right to remain on the premises of the Biltmore Hotel, nor does Highgate have any right to Biltmore Owner's trademark, financial information, bank accounts, employees, or other financial and operational information and data.

Trespass is the intentional invasion of another's property. *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996). "The requisite elements for a claim of trespass are the intentional entry by defendants on to plaintiffs' land and the wrongful use without justification or consent." *Kaplan v. Cnty. of Orange*, 528 F. Supp. 3d 141, 171 (S.D.N.Y. 2021). "A trespasser, to be such, need not intend harm to or unlawful interference with the other's property and may in good faith believe that he or she or it is in some way entitled to enter or remain upon the property." *Id.*

Similarly, to state a claim for conversion, a plaintiff must show: "(1) the property subject to conversion is 'a specific identifiable thing;' (2) plaintiff had 'ownership, possession or control' over the property before its conversion; and (3) defendant 'exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'" *Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004).

Highgate has ignored the Termination Letter, remains on the premises without permission, and retains Biltmore Owner's real property (*i.e.*, the Biltmore Hotel), confidential financial information, bank accounts, employee information, contracts with vendors, business assets, and all other operational data and information. Ex. 1 (DeCarvalho Decl.) at ¶¶ 4-5. Thus, Biltmore Owner can establish a likelihood of success on the merits for both trespass and conversion.

> iii. *Because the HMA and Highgate's agency were validly terminated, Biltmore Owner will likely prevail in its claims to specifically enforce Highgate's post-termination obligations.*

Under the HMA, "[u]pon any termination of this Agreement, [Highgate] shall cooperate with [Biltmore] Owner . . . to accomplish an orderly and expeditious transition of management functions to Owner." HMA at § 22.1 (Ex. B to Ex. 1 (DeCarvalho Decl.)). The HMA enumerates a non-exhaustive list of duties that fall under this covenant, including "delivering all cash, accounts and other property of Owner," "delivering all books, records and documents, including all Hotel Guest Data," and "making computer and software systems available to accomplish a smooth transition," among others. *Id.* Further, the HMA states that "Operator shall cease using the Owner's IP, or holding itself out as being affiliated with the Hotel, promptly upon termination of this Agreement for any reason." *Id.* at § 14.1.3.

Highgate has not performed its obligations under these covenants, even though the HMA has been terminated. Accordingly, Biltmore Owner is likely to succeed on its claims for breach of Highgate's post-termination covenants.

**5. At a minimum, there are serious question going to the merits of Plaintiffs' claims.**

As shown above, there are, at a minimum, "serious questions going to the merits" of the Biltmore Owner's claims, making them a fair ground for litigation. *Benihana,* 784 F.3d at 895. And, as explained in Section C, *infra*, the balance of hardships weighs decidedly in favor of

granting a TRO. Accordingly, to the extent the Court does not find the counts discussed *supra* meet the standard of "likely to succeed on the merits," the Biltmore Owner and Registrant respectfully submit that granting the TRO is still proper and warranted given the serious questions going to the merits of the Plaintiffs' claims.

C. The Balance Of Hardships Tips Heavily In Plaintiffs' Favor, And The Public Interest Would Not Be Disserved By The Issuance Of An Injunction Or TRO.

The hardships facing the Plaintiffs decidedly outweigh the potential hardships to Highgate (if any). The most that Highgate stands to lose is fees allegedly owed under the HMA. In the unlikely event that a court or arbitration panel finds that the HMA was improperly terminated, Highgate can be made whole with monetary damages. *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (explaining that balance of hardship analysis analyzes whether the harm each party suffers can be remedied after a final adjudication through damages); *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 377 (3d Cir. 1992). (noting that, as a matter of law, "a terminated franchisee's remedy for wrongful termination is an action for money damages, and not the continued unauthorized use of its franchisor's trademarks.") (quoting *Burger King Corp. v. Hall*, 770 F. Supp. 633, 638 (S.D. Fla. 1991)).  Furthermore, many courts have observed that it is not a "hardship" for a former licensee to cease its unauthorized, unlawful use of trademarks.  *See, e.g.*, *Flawless Style LLC v. Saadia Group LLC*, 2023 WL 3687782, at *6 (S.D.N.Y. May 26, 2023). On the other hand, if Highgate is permitted to continue ignoring the termination of the HMA, Plaintiffs face substantial and irreparable harm in the form of unauthorized control of its real property, trademarks, and other assets, and the continued occupation and control of the Biltmore Hotel by a revoked agent with a demonstrated history of incompetence and dishonesty. *Supra* pages 8-11.

In addition, the purpose of the "public interest" prong is to "ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Marks Org., Inc. v. Joles*,

784 F. Supp. 2d 322, 336 (S.D.N.Y. 2011) (citing *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)). Granting the TRO and/or preliminary injunction would not impose any disserve to the public interest. Rather, granting of the TRO and/or preliminary injunction would serve public interests, namely, the protection of ownership rights in real and intellectual property, the enforcement of legitimate contractual provisions, and the prevention and discouragement of fraudulent business practices. In the context of trademark misuse, "the public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion." *Church of Scientology Int'l*, 794 F.2d at 44. Where, as here, a licensee "once possessed authorization to use the trademarks," and subsequently "loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer." *Id.* Accordingly, both the balance of hardships and the question of public interest weigh decidedly in favor of granting the TRO and/or the preliminary injunction.

## CONCLUSION

Therefore, Plaintiffs respectfully request that the Court grant their motion and enter a TRO and/or preliminary injunction in an order substantially in the form set forth in the contemporaneously filed Proposed Order to Show Cause for Preliminary Injunction and Temporary Restraining Order.

Dated:  August 3, 2023                                Respectfully submitted,

By:    /s/ *Cynthia Augello*

Cynthia Augello
Warren Law Group
519 8th Ave, 25th Fl.
New York, NY 10018
(212) 390-8229
cynthia@warren.law

25

Daniel A. Dorfman
David J. Ogles (*pro hac vice pending*)
Anna R. Boshardy (*pro hac vice pending*)
Matthew T. Connelly (*pro hac vice pending*)
Fox Swibel Levin & Carroll LLP
200 W. Madison Street, Ste. 3000
Chicago, IL 60606
ddorfman@foxswibel.com
dogles@foxswibel.com
aboshardy@foxswibel.com
mconnelly@foxswibel.com

ATTORNEYS FOR PLAINTIFF WHB
BILTMORE LLC and MILLENNIUM &
COPTHORNE INTERNATIONAL
LIMITED